# CHARLESTON.

PAXTON LUMBER COMPANY, INC. v. PANTHER COAL COMPANY.

Submitted January 29, 1919.   Decided February 11, 1919.

1. MINES AND MINERALS—*Coal Mining Lease*—*"Right to Use Timber Standing or Being on Said Lands."*

    A coal mining lease conferring "the right to use the timber standing or being on said land" will be construed to grant the lessee the right to use the timber only for mining purposes, not to authorize a severance and sale or other uses characteristic of an unqualified ownership, unless the authority is conferred in express terms, or in terms so unmistakable as to exclude reasonable doubt as to the lessor's intention.   (p. 345). .

2. LOGS AND LOGGING—*Quantity of Lumber*—*"To be cut from the Manufacturer's Timber Holdings."*

    Though not every impossibility of full performance of a contract of sale will excuse the vendor, yet where such contract specifies the quantity of lumber sold as lumber "to be cut from the manufacturer's timber holdings," the contract is to be construed with reference to such qualifying phrase, and not as importing an absolute quantity irrespective of the designated source from which it is to be obtained, and if it shall thereafter appear impossible to obtain the quantity specified from the manufacturer's holdings because of insufficiency of timber thereon to produce the quantity, and neither party was aware of the insufficiency when they entered into the contract, the impossibility necessarily implies an element of mistake such as excuses performance beyond the timber capacity of the land.   (p. 346).

3. SALES—*Sale of Timber*—*Quantity*—*Warranty or Estimate.*

    Where a contract purports to sell goods identified by reference to independent circumstances, such as lumber to be cut from the manufacturer's timber holdings, with the qualification "about" or words of like import as to the quantity named, the contract applies to the specific timber thereon, and the specification of the quantity is not regarded as a warranty, but only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it.   (p. 346).

4. SAME—*Quantity of Goods*—*"About."*

    But where no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is material and governs the contract; the addition of the qualifying words, "about" and the like, operating only as a provision against

accidental variations arising from slight and unimportant excesses or deficiencies in number, measure or weight. (p. 348).

5. SAME—*Impossibility of Performance.*

Frequently the impossibility of performing a contract and mutual mistake excusing performance, when interposed in defense of an action thereon, have somewhat similar characteristics, and where the impossibility is due to a circumstance existing at the time of the bargain and relating to the subject matter thereof without the knowledge of either party, it partakes of the nature of a mutual mistake, and excuses performance to the extent the subject matter had no potential existence. (p. 348).

6. SAME—*Performance—Existence of Subject Matter.*

If the parties to a contract enter into it under the belief that the subject matter is in existence, and in effect condition their contract thereon, no contract exists if the subject matter is not then in existence, and if it exists in part only, performance after exhaustion of such part will be excused. (p. 353).

7. PLEADING—*Particular Statement of Defense—Motion—Statute.*

Section 63, ch. 125, Code, authorizing a plaintiff to apply for an order requiring defendant to file a more particular statement of his defense, impliedly requires promptness in making the motion. (p. 353).

8. SAME.

Ordinarily such a motion made when the case is called for trial approximately six months after issue joined upon the appropriate plea comes too late. (p. 353).

9. JUDGMENT—*Verdict—Judgment Non Obstante Veredicto.*

A judgment *non obstante veredicto* must be based upon the merits of the case as disclosed by the pleadings, and it cannot properly be invoked to serve the purpose of a motion to set aside the verdict in determining the sufficiency of the evidence. (p. 354).

Error to Circuit Court, McDowell County.

Action by the Paxton Lumber Company, Incorporated, against the Panther Coal Company. Judgment for defendant, and plaintiff brings error.        *Affirmed.*

· *Henry Roberts* and *Sanders, Crockett & Kee,* for plaintiff in error.

*Anderson, Strother, Hughes & Curd,* for defendant in error.

LYNCH, JUDGE:

Paxton Lumber Company, Incorporated, a corporation engaged in the purchase and sale of lumber, sued Panther Coal Company, also a corporation, whose principal occupation or business is the production and sale of coal, and incidentally only the manufacture of lumber, in assumpsit upon an account filed with the declaration for the value of timber contracted by defendant to be manufactured and delivered to plaintiff, but which, it is alleged, was neither manufactured nor delivered pursuant to the terms and requirement of the contract; and the Paxton Lumber Company prosecutes this writ to review and reverse the judgment for defendant for $666.51, the balance conceded to be due defendant upon shipments of lumber received and appropriated by plaintiff pursuant to the provisions of the contract.

The contract, dated March 22, 1916, proved and admitted and alleged to have been breached by defendant June 4, 1917, specifies the quantity, quality and grades of poplar, oak, chestnut and basswood to be furnished according to its stipulations, and the prices to be paid for the various grades, and the terms of settlement. The quantity designated is qualified or limited by the word "about" that is, about 950,000 feet in the aggregate for all kinds and grades of lumber; and the source from which it is to be derived by the phrase, "from the manufacturer's timber holdings," manufacturer being the designation given in the contract to denote the Panther Coal Company. Of the quantity contracted for, not to exceed 150,000 feet were delivered.

The timber which defendant had the lawful right to convert into lumber for its own use in the prosecution of its mining operations was that having a diameter of less than 16 inches and standing on the tract of 1,500 acres of land in McDowell County, demised, leased and let to defendant October 4, 1913, by the Sibley Coal & Coke Company, to remove the coal contained therein, and timber of that size could be used by defendant only for mining purposes. Timber over 16 inches in diameter was expressly excepted from the lease, but defendant subsequently purchased part of the timber of that size on the tract from its owners, and that constituted

the only timber which defendant had the right to cut for sale to others.

To what extent the Panther Coal Company complied with the requirements of its contract with the Paxton Lumber Company they do not agree, though the quantitative difference does not exceed 40,000 feet, and this disparity is due mainly to a misapprehension as to whether certain lumber, the sale and receipt of which is acknowledged and not disputed, was furnished in fulfillment of the contract or of a transaction of an independent nature completed between the date of the former and the alleged breach thereof. Though the contract of March 22 calls for no lumber less than 6/4, except basswood, the corresponding dimension of the controverted quantity was 4/4, and defendant insists it was taken up and paid for under the first agreement, while plaintiff urges the opposite view. It is doubtful whether basswood was part of the controverted quantity. Whatever may be the truth as regards these counter claims, there is no need to enter now upon an investigation of their merits, as the verdict of the jury has eliminated them from further consideration, together with plaintiff's right to any recovery whatsoever, unless we shall conclude that for some cause or upon some ground the judgment based upon the verdict should be set aside and a retrial ordered.

The important questions presented for consideration and decision necessitate a further recital of the facts indisputably established and those about which there is some controvery, and when these are ascertained and viewed in the light of the verdict and judgment, both of which stand upon a presumption in favor of their correctness, we must then determine by what law these facts are controlled and governed.

There was not at the date of the contract and at the time of its breach a quantity of timber owned and controlled by defendant sufficient to permit the manufacture of the requisite amount, grades and quality called for by the contract, not more, indeed, than defendant manufactured and delivered pursuant to its terms, unless the timber of less than 16 inches in diameter, which the Sibley Coal & Coke Company lease permitted defendant to use for mining purposes,

could lawfully be devoted to that purpose. The entire 1500 acres had theretofore virtually been denuded of merchantable trees or trees out of which merchantable timber demanded by the contract could be manufactured. The evidence introduced before the jury upon this phase of the controversy seems to be without substantial contradiction. It may without hesitation be said to be conclusive, except as to 584 trees, most, if not all, of which we assume were cut, milled and delivered to plaintiff. For apparently it was out of these trees that the lumber plaintiff received under the contract was obtained. What doubt may be said to exist, if any does exist, has no reasonable foundation or justification, and nothing was offered to show the fact to be otherwise than as stated.

Though this observation may not be wholly inapplicable to the proof of the smaller timber not cut and still remaining on the leased land, its applicability is not significant or important. It may be conceded, as Leckie, defendant's general manager of the coal mining operations on the land, admits, that probably there remain enough of that sort of trees standing on the large boundary to furnish the lumber required to complete the contract, a fact about which he frankly confesses a very limited knowledge, as he employs his time exclusively in the discharge of duties in nowise associated with the manufacture or sale of lumber. But by no lawful right could this timber, although sufficient to meet the requirements of the contract, be applied to the accomplishment of that end. The lease under the authority of which the coal mining operations are conducted sufficiently, though inaptly, denies the right to appropriate it except as authorized by that instrument. Its language is: "The lessee shall have the right to use the timber standing or being on said land within the following boundaries: (All timber on the right of way of the Norfolk & Western Railway and all timber over 16 inches in diameter on the Richard Lockhart land, the Adam and A. J. Cline land, and the J. J. Cline land excepted.)"

This being a mining lease, its grant of the right to use the timber must be construed as intending only such use

as may be necessary to effectuate the purpose of the demise. The provision is not infrequent, but usual, in coal mining leases. Timber is essential and indispensable in the exploitation of coal properties, and ordinarily a provident and cautious prospective operator endeavors to induce the owner of the superincumbent surface to concede the right to appropriate part of the timber thereon to such uses. Rare are leases of this kind that do not grant such concession. It enters into the consideration agreed to be paid for the main privilege and as incidental to it. The right of appropriation, however, seldom is enlarged into an unqualified ownership, such ownership as may be interpreted to authorize a severance and sale without regard to the generally prescribed limitations upon the right to use for mining purposes, except where the authority is conferred in express terms; and until the lessee finds it necessary to elect to exercise the right, title to the timber remains vested in the lessor or grantor, in this case in the Sibley Coal & Coke Company or its lessors. *Godfrey* v. *Weyanoke Coal & Coke Co.*, 82 W. Va. 665, 97 S. E. 186, 189.

These observations introduce the fundamental or basic legal problem the solution of which must determine the issues involved upon this writ. Tersely stated, the problem resolves itself into this question: May defendant lawfully be compelled directly or indirectly to acquire and manufacture timber other than that owned by defendant on its timber holdings, and deliver the product to plaintiff or suffer the damage consequent upon the failure so to do, notwithstanding the explicit qualifications of the contract?

A preliminary remark founded upon undisputed and unqualified proof will tend to enlighten the discussion and assist in its apprehension. It was through F. C. Frizzell, plaintiff's inspector and purchaser of lumber, that the negotiations between the Paxton Lumber Company and Panther Coal Company which resulted in the contract of March 22, 1916, were begun. Prior thereto he was upon the holdings of the defendant coal company, and ascertained and inspected the different kinds of trees standing thereon. With the knowledge thus acquired he took up with William Leckie,

general manager of defendant's coal mining operations, and only incidentally the representative of its lumber dealings, the proposal of inducing defendant to manufacture the timber on its "timber holdings" into lumber and sell the product to his principal; and when Frizzell ascertained through Leckie defendant's attitude toward effecting such a trade, he informed Paxton Lumber Company by letter, evidently specifying the different kinds, quality and grades of lumber available from such timber. Acting upon the information so acquired, the Paxton Lumber Company prepared and forwarded to Leckie the contract involved. Frizzell, being in the military service of the United States at the time of the trial, was not available as a witness, but it may not improperly be assumed that he possessed the qualification necessary to judge with reasonable accuracy the number and fitness of the trees to meet the requirements contained in the contract. Whether his estimates included the trees under 16 inches in diameter on the tract does not appear. If he did include them the estimate was not reliable. Counting them there probably was enough timber on the land to cut the required quantity of lumber, according to some witnesses, for there is some proof of the sufficiency and fitness of the timber on the tract at the time Frizzell examined it, all sizes and grades considered, to produce the lumber contracted for, and the lack of sufficiency if the smaller trees are excluded. Though the Paxton Lumber Company through its agent Frizzell may not have had actual knowledge of the nature of defendant's right to use those trees, it did have constructive notice afforded by the recorded Sibley Coal & Coke Company lease, and hence knowledge of the prescriptive limitation.

Finally, what of the legal principles determinative of the question of liability predicated upon these facts, or, what is but another mode of stating the same proposition, what effect must be accorded the word "about" as quantitative description of the lumber sold, and the phrase, "from the manufacturer's timber holdings," as prescriptive of the source from which the timber was to be manufactured as well as of the quantity thereof?

The addition of the qualifying words, "about," "more or

less," in a contract for the sale and shipment of a quantity of cord wood, says the Supreme Court of the United States in *Brawley* v. *United States*, 96 U. S. 168, 171, or of iron rails, as in *Norrington* v. *Wright*, 115 U. S. 188, 204, is a provision "against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure or weight." This, the court says, is the rule of construction when no independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified then being material and governing the contract. "About," as used in the contract now examined, might, if unaided by other prescriptive terms or phrases, be susceptible of the same interpretation, that is, as providing only against a small discrepancy in quantity. However, in the federal cases cited, its use in another connection is noted by the court, saying: "Where a contract is made to sell or furnish certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped by his agent or correspondent in certain vessels, and the quantity is named with the qualification of "about," or "more or less," or words of like import, the contract applies to the specific lot; and the naming of the quantity is not regarded as in the nature of a warranty, but only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it." The quotation just cited is applicable to this case, for the use of the qualifying phrase, "to be cut from the manufacturer's timber holdings," limits the contract to the specific timber on defendant's lands. See *Crislip* v. *Cain*, 19 W. Va. 438, pts. 17 and 18 syl., overruled in part, though not as to the interpretation of these or similar qualifying words, by *Newman* v. *Kay*, 57 W. Va. 98, 110; and also *Winton* v. *McGraw*, 60 W. Va. 98, and *Pickens* v. *Pickens*, 72 W. Va. 50, where certain qualifications are noted with respect to these rules in cases involving deficiency in the acreage of land.

In this conection it is relevant to remark upon the suffi-

ciency of the proof to warrant the finding of the jury as to the good faith of the defendant in its efforts to comply with its engagements, that, in the voluminous correspondence regarding plaintiff's demands for shipments to satisfy its customers and defendant's endeavors to meet such demands and his assignment of one cause or another for his failure to do so, the latter in no letter and at no time intimated that delay on its part was due to want of timber on land owned or controlled by it; nor was there such an intimation except and until during the progress of the trial, when this defense was brought for the first time to plaintiff's knowledge. These matters and accompanying circumstances, however, as we have said, were submitted to the judgment and arbitrament of the triers of fact, and their verdict cannot be disturbed unless good cause be shown therefor.

As we have also remarked, the qualifying phrase, "to be cut from the manufacturer's timber holdings," limits the contract to such timber as was on defendant's lands, and since the amount was only sufficient to yield about one-sixth of the total number of feet contracted for, the questions of impossibility of performance and mistake are at once presented. A pioneer case having some relevancy to the main question in issue is *Lord Clifford* v. *Watts*, L. R. 5 C. P. 577. The issue was one of liability on the part of the lessee under a demise of a tract of land for the annual production of merchantable clays of not less than 1000 tons upon a prescribed rental during a specified term. Afterwards it appeared that the premises contained no such clay, and the lease reserved no minimum rent to be paid in that event. An equitable plea was interposed by defendant that no liability attached because he could not at any time within the term dig 1000 tons of clay a year, as there was not at the date of the demise or since under the land in question so much clay, wherefore performance was impossible and the impossibility unknown to him when he made the covenant, and he had no reasonable means of ascertaining that fact. The court sustained the plea upon demurrer and expressed the opinion upon the construction of the deed that it was the intention of the parties that the covenant to dig not less than 1000 tons of clay in

each year should not take effect unless there was clay to that amount in the lands demised. "The covenant is based upon the assumption that there was clay there. It was impossible to perform it unless there was; and the covenantor did not undertake an impossibility, but merely to dig and remove such clay as should be found in the land, to the extent stipulated for."

*Scioto Brick Co.* v. *Pond,* 38 Oh. St. 65, reiterates the same doctrine, the contract in issue being a demise to mine clay of a designated quality, and providing that the lessee shall mine or cause to be mined or pay for not less than 2,000 tons every year during the term, and for the payment of a specified sum monthly as the clay is taken away; and, as appears from head notes, it was held that if clay of that quality and in quantity sufficient to justify its being mined existed, the lessee on failure to mine at least 2,000 tons per year during the term was bound to pay therefor at the prescribed rate. But if in fact clay of that quality and quantity could not by the use of due diligence be found on the land, no such obligation to pay arose, and that the burden rested upon the defendant to prove these exculpatory facts. As sustaining the same proposition, see *Blake* v. *Lobb's Estate,* 110 Mich. 608, where it was said that as the lease was made for the purpose of exploring for, mining and taking out merchantable iron ore, the lease presupposed the existence of the ore, and that on its appearing that no such ore was to be found, the purpose failed, and defendant should not be charged with the consideration; *Gribben* v. *Atkinson,* 64 Mich. 651, where, construing an iron ore or mining lease, no ore being discovered, the court held to the same effect and in practically the same language as in the last preceding case.

The legal propositions enunciated by these decisions appear to be sound and worthy of implicit confidence, and go far to meet the situation disclosed by this case, though they may apply only indirectly to its facts, because here there was only a partial not a total failure to discover the thing contracted for, and to that extent the contract was performed. They form a solid foundation upon which to base a similar con-

clusion upon the merits of this case, for we think the same
principles are applicable.

Nor is there want of ample authority to uphold defendant's
contention.    A like demise for mining iron ore, whose coven-
ants the lessees partly performed, is found in *Muhlenberg* v.
*Henning*, 116 Pa. St. 138.    When sued for a breach thereof
the lessees set up the defense, which the court sustained as
sufficient to defeat the action, that, although they had oper-
ated the mine in a workmanlike and skillful manner for
about nine months, yet on account of the nonexistence of
sufficient ore and its inferior and unmerchantable quality,
they were unable to continue to mine it at a profit.    For the
breach thus occasioned the lessors brought an action on the
covenant to mine annually 1500 tons of ore or in default
thereof pay $525.    In the opinion the court said: "We are
not to construe the contract to require the lessees to perform
an impossible thing.    The $525 is not a penalty, it is the price
of the ore.    The grant was of the ore in place, and, if the sub-
ject matter of the contract fail, the price is not payable.    If
there was no ore to mine, there could be no royalty to pay.
As well might the vendor of meat which proved to be putrid,
or of a cargo of corn which had no existence, enforce collec-
tion from his vendee.    We think the manifest meaning or in-
tention of the parties, as exhibited by the terms of the con-
tract, was that fifteen hundred tons 'of clean and merchan-
table iron ore' were to be mined in each year, if that quality
and quantity of ore were there found, and that the contract
by necessary implication must be so construed." See also
*Boyer* v. *Fulmer*, 176 Pa. St. 282; *Ridgeway* v. *Conewago Iron
Co.*, 53 Fed. 988; *Flavelle* v. *Red Jacket Consolidated Coal
& Coke Co.*, 82 W. Va. 295, 96 S. E. 600.

Similarly, in a case involving a contract for the sale and
delivery of 200 tons of a specific crop of potatoes to be grown
on defendant's land, and he planted sufficient seed to grow
more than the quantity specified in an average year, but the
crop was attacked by a disease and he was unable to meet
his engagement except in part, it was held that the contract
must be taken to be subject to the implied condition that
the parties shall be excused, if before breach performance

becomes impossible because of the perishing of the thing without the contractor's default. *Howell* v. *Coupland,* L. R. 9 Q. B. 462. As to a like failure of a peach crop sold and in part delivered, but for which the purchaser refused to pay, and sought to defeat the action on the ground of non-compliance with the terms of the contract, see *Ontario etc. Ass'n.* v. *Packing Co.,* 134 Cal. 21.

The term "impossible" or "impossibility" of performance employed in these decisions and in some text books is not wholly appropriate. "Mistake," according to Williston on Sales, § 660, is the more apt word. "The nature of the defense of impossibility is very similar to that of mistake. Indeed many cases that are ordinarily classed as cases of impossibility should rather be classed under the heading of mistake. Impossibility of performance may be due either to a circumstance existing at the time the bargain was made, or to supervening circumstances which render performance in the future impossible, though not impossible when the bargain was made. Impossibility of the former sort generally involves mistake."

So in this case, the impossibility of performance being due to a circumstance existing at the time the bargain was made, partakes of the nature of a mistake respecting the existence of the subject matter of the contract. "If the parties to a contract enter into it under the belief that the subject matter or consideration is in existence, and in effect condition their contract thereon, no contract exists if the subject matter is not then in existence." 1 Page on Contracts, § 72; 1 Elliott on Contracts, § 102; 13 C. J. 373; *St. Louis etc. Ry. Co.* v. *Johnston,* 58 Tex. Civ. App. 639; *Allen* v. *Hammond,* 11 Pet. 63.

Though, generally speaking, a promisor is bound to comply with the express terms of his agreement, there appears to be manifestly increasing tendency to afford him relief upon equitable principles where great hardship necessarily would ensue by forcing him to do what circumstances have rendered practically impossible of performance. This reasonable rule is exemplified or illustrated in the cases cited, and aptly fits the situation appearing in this case, of which plaintiff

had, it appears, as much if not more knowledge than defendant had when they entered into the contract. Frizzell. we repeat, inspected the timber, knew its quantity and quality, and what he knew his principal, the plaintiff, knew. He reported separately to each of the contracting parties, gave them the information which served as the basis of the preliminary agreement which later became the written contract, prepared at the instance and direction of the plaintiff without defendant's knowledge of its terms and without previous: consultation with him, and the first intimation the latter had! of its contents was obtained upon the receipt of the contract. through the mail.

It is not every impossibility of performance that relieves a promisor. But where there is a contract for a specified. quantity of lumber qualified by the phrase, "to be cut from: the manufacturer's timber holdings," the quantity contracted! for will be construed to be limited by the qualifying phrase, thus making it a contract to sell specific lumber to the extent of the quantity named, not an absolute contract to sell that quantity of lumber irrespective of the source, and if it later appears that the manufacturer's holdings do not contain timber in the quantity named, and that the parties were equally ignorant of the true state of facts, the impossibility of obtaining the specified quantity from such lands necessarily implies an element of mistake in entering into the contract. such as entitles to relief from performance beyond the quantity of timber capable of being cut therefrom. It should be noted, however, that if the contract had specified the quantity without any phrase limiting the source of the timber, the absolute duty then would have devolved upon defendant to. procure that quantity from any source available.

Plaintiff complains of the refusal of the motion to require defendant to file a more specific statement of the grounds of: defense to the action. The statute, section 63, ch. 125, Code, authorizing such procedure, provides against unreasonable delay and impliedly requires promptness in making the motion, and proof of good cause therefor. Though the defendant filed the plea appropriate to the action in term time, February 12, 1918, plaintiff did not make the motion until June

12 of the same year, when the court "after hearing evidence on said motion and maturely considering the same," overruled it and refused to continue the case. Diligence required immediate not delayed action in an endeavor to invoke the benefit of the statutory provisions, and seems not to have been exercised by the plaintiff. *Norfolk & Western Ry. Co. v. Spears,* 110 Va. 110; *Fayette Liquor Co. v. Jones,* 75 W. Va. 119, 123.

Nor is the case presented such as warrants resort to the motion for judgment notwithstanding the verdict. We have had occasion recently to say that such a motion is inappropriate except when justified by the pleadings. It is not proper when based merely upon the lack of sufficient evidence to support the verdict. *Holt v. Otis Elevator Co.,* 78 W. Va. 785, L. R. A. 1917A. 1194; *Shafer v. Security Trust Co.,* 82 W. Va. 618, 97 S. E. 290. A request timely made for a new trial is the recognized and only proper procedure in such cases.

It is not necessary to pass seriatim upon the instructions said to be erroneously given, modified or refused, as it suffices to say that in so far as they are inconsistent or harmonious with the principles laid down, they were not improperly given or refused. For the various reasons assigned we are of opinion to affirm the judgment.

*Affirmed.*