## ANDERSON, ET AL. v. CLIFF GOLD MINING CO.

### (Two cases)

(Nos. 1855, 1856; December 11, 1934; 38 Pac. (2d) 334)

Case No. 1855 was submitted for appellant on the brief of *W. W. Tipton,* of Laramie.

Case No. 1856 was submitted for appellant upon the brief of *F. E. Anderson* and case No. 1855 for respondent was also submitted on the brief of *F. E. Anderson*.

Reply brief for appellants in case No. 1855 and answer brief of respondents in case No. 1856, by *W. W. Tipton.*

RINER, Justice.

These two cases in this court are predicated upon the same record and come here under the direct appeal method of review, for the purpose of questioning a judgment of the District Court of Albany County. Specifications in error have been filed by the several parties, each claiming the judgment to be erroneous in certain particulars. The briefs in these cases have been consolidated. In consequence of these facts and the views we entertain concerning the questions raised, one opinion will suffice to dispose of the litigation as it now appears at bar.

The action in which the record aforesaid was made was commenced in the district court above mentioned, by Frank E. Anderson and Jacob Schnitzler, who will generally be hereinafter referred to as the "plaintiffs" or by their respective names, against the Cliff Gold Mining Company, a Wyoming corporation, subsequently herein mentioned as the "mining company" or as the "appellant."

The petition of the plaintiffs, to summarize it, pleaded an alleged "mining lease and agreement" entered into between them and the mining company on September 30, 1932, the performance by the plaintiffs of the requirements of that agreement resting upon them; an alleged attempted wrongful cancellation of

this agreement by the mining company; and a prayer that the court interpret the contract, define the rights of the parties, and give supplemental relief under the terms of the Uniform Declaratory Judgments Act of this state. Briefly, the answer of the mining company admitted that the parties had theretofore entered into the agreement aforesaid, denied that plaintiffs had performed the obligations incumbent upon them thereunder, and denied that the mining company had wrongfully undertaken to cancel the contract. It also affirmatively alleged that plaintiffs had abandoned the property leased and had failed to work it as the agreement required, on account of which fact the mining company had, as permitted by the terms of the contract, cancelled it. The answer prayed that the plaintiffs take nothing by their action. Plaintiffs' reply, in substance, placed in issue the affirmative matter set forth in the answer.

The trial of the case was to the court without a jury. But two witnesses, the plaintiffs themselves, testified when the case was heard, the mining company introducing no testimony whatsoever. The facts necessary to an understanding of the problems submitted for our solution would appear to be essentially these:

The plaintiffs are the owners of certain patented mining claims, known as the Ocean Wave and the Ocean Wave No. 1. The mining company owns ground adjoining and parallel to the two claims aforesaid and on the northwest side thereof. A tunnel seems to have been driven into the mining company's property, which has been extended into the ground patented to the plaintiffs, a distance of some seventy feet. Differences having arisen between the parties, plaintiffs instituted an action in the district court against the mining company, seeking, among other things, the cancellation of a prior agreement between them relative to the ground

in which the tunnel aforesaid was located. This action was pending on September 30, 1932, when the parties, represented by their respective counsel, in an effort to reach an amicable settlement of their difficulties, entered into the "mining lease and agreement" previously mentioned, as pleaded in plaintiffs' petition.

That agreement in effect provided that the plaintiffs should have the use of the tunnel aforesaid for the purpose of mining, prospecting, and removing ore from their own property, for an indefinite period, and also the right to use the track in said tunnel with the machinery and buildings connected therewith. As a consideration for these rights and also the leasing to them of the Cavanaugh winze hereinafter referred to, the plaintiffs, it was agreed, should dismiss the pending litigation between them and the mining company and should deed to the latter, seventy feet of ground, a part of the patented property of the plaintiffs which had been cut by said tunnel, this deed to contain certain reservations. The plaintiffs also agreed to pay to the mining company certain trackage charges on ore removed from the plaintiffs' ground, with a minimum monthly charge when hauling ore and a depreciation charge on the machinery of that company when used by the plaintiffs. The agreement of the parties provided, also, that mining ore by the plaintiffs from their own ground was optional with them, and a failure to do that would not work a forfeiture of the lease.

It appears that a winze, designated in the record as the "Cavanaugh winze," was situated in the tunnel aforesaid, about 534 feet from its mouth. The contract of the parties, in addition to its provisions already described, specifically leased this winze to the plaintiffs, together with fifty feet of the tunnel site on either side of said winze, for a period of five years, granting to plaintiffs the right to excavate ore from the one hun-

dred feet thus affected. They were required to pay to the mining company fifteen per cent of all ore taken out from this particular piece of ground, as a consideration for the privilege so given. The mining operations relative to the winze and adjoining footage were quite elaborately governed by extended provisions of the agreement aforesaid, among them being, "To work said winze steadily and continuously so as to take out the greatest amount of ore possible and not less than thirty (30) shifts of eight (8) hours each, during each and every calendar month during the remainder of the term of this lease." It was stated in the agreement that time was of the essence thereof, and all things required to be done by the plaintiffs should be "fully and substantially performed within the respective periods provided for such performance." The mining company was accorded the option of forfeiting the agreement in case of any substantial violation of any of its covenants or agreements required to be kept by the plaintiffs. The contract further declared that, "all the terms and conditions in this lease contained shall apply to both the tunnel site lease and the One Hundred (100) foot winze lease in so far as applicable." The foregoing is, we think, a fair resume of the clauses of the agreement between the parties, which are material to be considered at this time.

It appears that the plaintiffs, immediately upon signing the aforesaid "mining lease and agreement," dismissed their pending litigation against the mining company, and also executed and delivered to the latter their deed to the seventy feet of ground lying along the northwest sideline of the Ocean Wave patented ground, as they had agreed to do. This deed was accepted by the mining company and duly recorded.

Shortly afterwards, the plaintiffs went into the tunnel aforesaid and, for about thirty days, worked that

portion thereof covered by the provisions of the agreement relative to the Cavanaugh winze, with the result, as testified by Mr. Anderson, one of the plaintiffs, on cross-examination, in response to the question:

"Q. How many tons of ore did you take out during the entire time you worked that winze?"

"A. I didn't take out any ore. There wasn't any there to take."
This statement stands undisputed by any testimony in the record.

The mining company was, by letter on behalf of the plaintiff, advised of this absence of ore, and the latter discontinued work in that part of the tunnel about the fifth day of November, 1932. Thereafter and in the spring of the following year, upon the plaintiffs notifying the mining company of their intention to proceed with work through the tunnel upon their own ground, i. e., the Ocean Wave patented property, they were met by a refusal on the part of the mining company to permit them so to do. By correspondence they were told that the entire agreement had been declared forfeited by that company, on account of plaintiff's failure to continue work as required by its terms. April 22, 1933, the action was commenced in which the judgment now here for review was rendered.

In that judgment the district court found, among other things, that the plaintiffs ceased work on the Cavanaugh winze because there was no ore of value within it or the fifty feet of tunnel site on either side of said winze; that no damage to the mining company had been shown by the proofs; and that the agreement could not be forfeited by it as to the use of the tunnel by the plaintiffs, on account of their failure to work the Cavanaugh winze. It was adjudged that the mining lease and agreement aforesaid be declared to be in full force and effect until such time as the mining company

should deed back to the plaintiffs the seventy foot strip of ground previously transferred to it by the plaintiffs; and that plaintiffs should, accordingly, have the right to use the tunnel in mining ore from their own ground and from the Cavanaugh winze property. Other provisions were embodied in the judgment which are not material to be considered on this appeal.

The main controversy subsisting in the cause is whether the mining company was mistaken in its attempt to forfeit the entire lease, as was adjudged by the district court. Many cases relating to forfeiture in connection with mining agreements are cited by the appellant, and with the principles therein announced no fault can, generally speaking, be found.

As we have said, the trial court found that the plaintiffs stopped work on the Cavanaugh winze ground because there was no ore of value there. This finding is challenged by the mining company, and our attention is directed to a letter written by Anderson, one of the plaintiffs, on November 26, 1932, to the counsel for the mining company, and appearing in the record, wherein the writer states that he sampled a vein of ore in the tunnel and found it ran about $5.25 per ton. It is urged that this establishes that the court's finding was wrong. But Anderson testified positively, as before stated, that he took no ore out in the course of his work on the winze and adjoining ground, and that there was no ore there. The statement in the letter utterly fails to identify the place where the sample was taken, and even if it had done so and should be regarded as a safe guide in the matter, there is no evidence whatsoever in the case that $5.25 ore could have been mined so as to produce a profit, a result both parties obviously contemplated by their contract.

Taking this fact established by the court's finding as true, as we think we must, the following authorities would appear to be pertinent:

In 40 C. J. 1023, the text states that:

"The lessee is excused from further performance or working of the mine, where the mineral has become exhausted or cannot be found; and under some leases, he is excused from further performance, as provided for in the lease, where the mine cannot be worked or operated at a profit, or cannot be carried on with reasonable effort and expenditure."

In Cosden Oil & Gas Co. v. Moss, 131 Okl. 49, 267 P. 855, 859, we find the court declaring the law to be:

"Where it is apparent that a contract was entered into on the basis of the existence of something essential to its execution, there is the implied condition of the contract that if literal performance becomes impracticable or impossible by reason of the nonexistence of the essential thing, to the extent of nonexistence performance will be excused, and in such circumstances the terms 'impracticable' and 'impossible' are of equal legal effect. Mineral Park Land Co. v. Howard, 172 Cal. 289, 156 P. 458, L. R. A. 1916F, 1; Virginia Iron, Coal & Coke Co. v. Graham, 124 Va. 692, 98 S. E. 659; Kinzer Construction Co. v. State, (N. Y. Ct. Cl.) 125 N. Y. S. 46; Fritzler v. Robinson, 70 Iowa, 500, 31 N. W. 61; St. Louis S. W. Ry. Co. v. Johnston, 58 Tex. Civ. App. 639, 125 S. W. 61; Usher v. Hiatt, 18 Kan. 195; Woodworth v. McLean, 97 Mo. 325, 11 S. W. 43; Paxton Lbr. Co. v. Panther Coal Co., 83 W. Va. 341, 98 S. E. 563; 13 C. J. 640, § 714."

The conclusion of the opinion in Byrd v. Anderson, 207 Ky. 317, 269 S. W. 323, 325, is couched in the following language:

"In the case at bar it is perfectly plain that the lease of the gas well was made for the purpose of the operation of a carbon black plant, which requires for its operation a continuous and steady flow of gas. It is hard to presume that the parties would have made the contract they did, except on the assumption that gas would continue to flow during the period of the contract. The evidence developed in the case, as far as it was allowed to go, showed that, although there might be some gas in the well, yet on account of the absence

of pressure it would not flow, and a gas well which does not flow is the same as no well at all. Under the principles announced in the cases cited, and especially the Auxier Case from this jurisdiction, the exhaustion of the flowing gas must in our view of the law be held to have the effect of terminating the lease. The gas having ceased to flow through no fault of the appellants, it necessarily results that the lease was terminated."

In Woodworth v. McLean, 97 Mo. 325, 11 S. W. 43, 17 M. R. 194, where the defendant stipulated to sink a mining shaft five hundred feet "on the vein of ore, cropping out on said claim," the court, in disposing of the case, stressed as the ground of its decision:

"If, in the progress of the work, all indications of valuable mineral ceased and the vein of ore ran out entirely, there was no obligation on McLean to proceed further. The question whether the vein of ore had ceased is one of fact to be tried in the usual way. As the work stopped within the five hundred feet, the burden of proof rested on him to show that the vein of ore (along which the shaft was to proceed) had terminated, for the contract itself asserts the existence of the vein at the beginning. But on establishing that fact the requirements of the contract would be met and there would be no breach whatever."

So, in Swiss Oil Corporation v. Riggsby, 252 Ky. 374, 67 S. W. (2d) 30, 33, where it was positively shown that at the time of the abandonment of the lease, gas was no longer present in paying quantities, the court said in the course of its opinion:

"There is another principle widely recognized and applied to various classes of contracts. It is thus stated in Texas Company v. Hogarth Shipping Company, 256 U. S. 619, 41 S. Ct. 612, 614, 65 L. Ed. 1123: 'It long has been settled in the English courts and in those of this country, federal and state, that where parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and avail-

ability the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it.' * * *

"We cannot, therefore, agree with counsel for appellant that only the explicit letter of the contract must be regarded. The law recognizes that the continuation of the subject-matter of the contract is the essential foundation of the obligation. And when that subject-matter is shown to have become nonexistent, performance is excused and the contract terminates by operation of law. 6 R. C. L. 1005; Hall v. Eversole's Adm'r, 251 Ky. 296, 64 S. W. (2d) 891. As stated in Willis' Thornton on Oil and Gas, § 243: 'As the object in leasing oil or gas premises is to secure the oil or gas beneath the surface, as soon as it has been demonstrated that no oil, in case of an oil lease, or no gas, in case of a gas lease, is beneath the surface, or it does not exist in paying quantities, the lessee may abandon the premises or his lease; or if the oil or gas becomes exhausted he may in like manner abandon them.' * * *

"Except for the supposition of the presence of gas and its continuation throughout the period of the lease, there would have been no contract. Continuation and profitable production were contemplated. It was demonstrated that at the time of abandonment and refusal to pay the annual royalty there was no gas there. The drilling of the wells would have been futile. It is not denied that the drilling would have effectually erased the obligation. Obviously if that had been done, since the gas was not there, the lessor could have collected nothing under the contract and the contract would have ended even though it is silent in that respect. * * *

"The principle of declaring or considering a lease terminated and the royalty obligation canceled when the subject-matter fails has been considered and applied in several cases where coal and other solid minerals were shown to have been exhausted or to be nonexistent. Many of them are reviewed in Laurence E. Tierney Land Company v. Kingston-Pocahontas Coal Company, 241 Ky. 101, 43 S. W. (2d) 517. See,

also, Byrd v. Anderson, supra; and Hall v. Eversole's Adm'r, supra; 40 C. J. 1005."

Similarly, the opinion in the case of Virginia Iron, Coal & Coke Co. v. Graham, 124 Va. 692, 98 S. E. 659, 662, states that:

"Where, from the nature of the contract itself it is apparent that the parties contracted on the basis of the continued existence of the substance to which the contract related, a condition is implied that if performance becomes impossible because that substance does not exist, this will and should excuse such performance."

Again, in Buchanan v. Layne, 95 Mo. App. 148, 68 S. W. 952, 953, the court construed the contract before it thus:

"The contract was not, generally, to mine and place ore upon the market, but it was to take ore from a certain defined and described tract of land and place it upon the market. Undoubtedly the contract was based upon the assumption that ore could be found; that is, would continue to exist on said tract. It was not within the contemplation of either defendant or plaintiff that ore should be produced and marketed at all hazards; for the ore that was to be produced and marketed was to be taken from certain land, and if that land had become exhausted of ore, if ore had ceased to exist on that land, then it must have been understood by the parties that that portion of the contract would not be expected to be performed."

See, also, Williston on Sales, § 661; 3 Williston on Contracts, §§ 1933, 1963; Bishop on Contracts (2d Ed.), § 588; 6 R. C. L. 621, § 41; McCaull-Webster Elevator Co. v. Steele, 43 S. D. 485, 180 N. W. 782.

It is plain from the provisions of the mining lease and agreement between the parties now at bar, it contemplated the existence of ore in the Cavanaugh winze and the one hundred feet of tunnel site to be worked with it, which could be taken out at a profit. Otherwise, its clauses as to royalty payments, smelter returns,

etc., would be quite without meaning. Under the established facts in this record, such ore not being existent, it should be held that it was understood by plaintiffs and the mining company alike, that the winze lease portion of the contract could not be expected to be performed, as a binding obligation. The other portions of the contract properly could be, as the district court has decreed. Under the circumstances presented, it seems to us it was very equitably adjudged that the remainder of the contract might remain in force until the mining company deeded back the property it received. It is difficult to assume just what influence the absence of the ore in the winze ground, if known before, would have had in the formation of the contract. Accordingly, we believe that the district court very well entered the judgment it did.

The other questions argued in the briefs would appear to hinge on the disposition of the principal question in the case, disposed of above, and need not require attention at our hands at this time.

The judgment appealed from should be and it is affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.