MEUSE–RHINE–IJSSEL CATTLE
BREEDERS OF CANADA LTD.,
Appellant (Plaintiff below),

v.

Y–TEX CORPORATION, Appellee
(Defendant below).

No. 4936.

Supreme Court of Wyoming.

Feb. 8, 1979.

Rehearing Denied March 9, 1979.

James W. Owens (argued), of Murane &
Bostwick, Casper, for appellant.

L. B. Cozzens (argued), and Charles G.
Kepler, of Simpson, Kepler, Simpson & Coz-
zens, and William P. Rohrbach, Cody, for
appellee.

Before RAPER, C. J., and McCLIN-TOCK, THOMAS and ROSE, JJ., and GUTHRIE, J., Retired.*

RAPER, Chief Justice.

This appeal arises from an order of the district court granting the motion for summary judgment made by defendant-appellee, Y–Tex Corporation (Y–Tex). The plaintiff-appellant, Meuse-Rhine-Ijssel Cattle Breeders of Canada Ltd. (MRI), appeals from the order, contending that a factual dispute in regard to the parties' agreement was created by the evidence presented, that the law of "impossibility of performance" and "frustration of purpose" was inappropriately applied by the district court, and that there was no breach of contract by MRI.[1]

We will reverse the summary judgment and remand for trial.

MRI is in the business of producing and selling bovine semen for artificial insemination. Y–Tex was in the business of selling and distributing bovine semen for producers such as MRI. On June 21, 1974, MRI and Y–Tex entered into an agreement which generally provided that Y–Tex was to be the exclusive distributor of MRI semen on the "American Continent". This agreement was performed by the parties until, on July 14, 1975, an understanding was reached whereby the June 21, 1974 exclusive distributing agreement was terminated, subject to certain terms and conditions.[2] We set out in its entirety the crucial July 14, 1975 termination agreement:

"As per our various telephone conversations, Y–Tex Corporation and Meuse-Rhine-Ijssel Cattle Breeders of Canada Ltd. have agreed to terminate our contract dated the 21st day of June, 1974, on the following terms and conditions:

"1.  It is agreed and understood that Y–Tex has sold 12,901 semen units from the bull, Mr. Image, which semen has not yet been delivered to Y–Tex. Meuse-Rhine-Ijssel Cattle Breeders of Canada Ltd. hereby agree to deliver to Y–Tex all semen collected from the bull, Mr. Image, as per our original contract mentioned above, until such time as these orders have been filled. Once the 12,901 semen unit order has been filled, Y–Tex shall have no claim to any semen production, and our agreement shall terminate.

"2.  Y–Tex Corporation hereby agrees to allow Meuse-Rhine-Ijssel Cattle Breeders of Canada Ltd. the right to sell or contract with others to sell future semen production from Mr. Image so long as it is specifically understood that any semen produced by Mr. Image will first be applied to Y–Tex's order for 12,901 semen units as per our original agreement.

"If this substantially outlines our agreement, please approve this by signing a copy of this letter and, after retaining one executed copy for your records, return an executed copy for our records."[3]

MRI alleges that Y–Tex failed to live up to its end of the bargain in that MRI stood ready to deliver the 12,901 units of semen but Y–Tex "refused to accept sales and sales orders from customers for the sale of the 12,901 units of semen." In the district court the parties disputed the meaning of the July 14, 1975 agreement. MRI claimed it was a firm order for 12,901 units of

---

* At the time of oral argument, Guthrie, J., was Chief Justice. He retired from the court on December 31, 1978. By order of the court, entered on January 1, 1979, he has been retained in active judicial service pursuant to § 5, Art. V, Wyoming Constitution and § 5–1–106(f), W.S.1977, and has continued to participate in the decision and opinion of the court in this case.

1.  Y–Tex had counterclaimed alleging breach of contract by MRI. Y–Tex and MRI stipulated to a dismissal of the counterclaim, without prejudice on the same date the summary judgment was entered and before notice of appeal.

2.  The reason for this termination was that Y–Tex was going out of the semen business. A substitute distributor was to take over the distribution of MRI's production.

3.  MRI's signed approval is endorsed on the letter.

semen. Y–Tex claimed it was only a reservation of up to 12,901 units of semen but that it was under no obligation to buy any semen. Y–Tex's argument was based on the fact that nowhere in the agreement did Y–Tex say it agreed to "buy" 12,901 units of semen. Further, Y–Tex argued, the June 21, 1974 agreement provided:

"MRI CATTLE BREEDERS agree to provide Y–TEX at Cody, Wyoming, such M.R.I. semen as Y–TEX shall from time to time order, subject however to. the actual production of semen by each bull in question."

The district judge agreed with Y–Tex's argument and, although he stated he had difficulty with the "reservation" theory because a specific number was used, he concluded, after citing the above passage from the parties' June 21, 1974 agreement:

"In the Court's opinion then the only obligation on the defendant at the time of the original contract was to purchase whatever semen it so desired even if that included no orders on the part of the defendant and was restricted in quantity only from a production basis. Construing this contract together with the oral termination and the July 14, 1975 letter, the Court feels that the defendant has established his point and that the specific number of doses set forth in said letter was a reservation and a reservation only. Therefore, the defendant was not obligated to buy any semen from the plaintiffs but could if it so desired purchase semen in amounts not to exceed 12,091 [sic] doses." [4]

Y–Tex also raised in the district court the questions of impossibility of performance and commercial frustration. In part, the district court based its decision to grant the motion for summary judgment on these issues. The district judge stated that impossibility of performance by Y–Tex was created by cancellation of orders by customers of Y–Tex because semen was not available during the breeding season. Further, he concluded that there was commercial frustration, and that Y–Tex had no obligation to find new customers.[5] The thrust of the

---

4. The district court's decision letter was not a part of the record on appeal. Nonetheless, it was presented to this court by both parties, and we shall consider it as though it were a part of the record. We shall treat it as a stipulated omission which we have corrected pursuant to Rule 75(d), W.R.C.P.

5. Further text of letter decision by District Judge:

"Ordinarily it would be unnecessary for the Court to discuss any of the remaining arguments of the defendants but since the Court feels that the defendant has at least one more stronger and pertinent argument, it is also going to consider the question of the impossibility of performance on the part of the defendant insofar as its orders with its customers were concerned. I don't think there is any question but what the defendant was unable to fill the orders for which it had contracted because the semen was not available during the breeding season for which it was needed thereby causing the cancellation on the part of the defendant's customers. There are some 18 affidavits contained in the file so asserting and it is uncontroverted that the defendant's failure to supply the semen so ordered as set forth in the affidavits was due to the lack of semen being furnished to it by the plaintiff.

"In the case of *Anderson vs. Cliff G. N. [M.] Company*, a Wyoming case, 47 Wyo.

349, [38 P.2d 334], the Wyoming Supreme Court said in part:

'We cannot, therefore, agree that the only explicit letter of the contract must be regarded. The law recognizes that the continuation of the subject matter of the contract is the essential foundation of the obligation. And when that subject matter is shown to have become non-existent, performance is excused, and the contract terminates by operation of law.'

"The law of this case can be applied precisely to the facts in this case. The plaintiff agreed to furnish semen to the defendant for resale to customers of the defendant, those customers then cancelled their orders when the defendant was unable to furnish the semen at a time when it was required and by reason thereof the subject matter became non-existent so performance on the part of the defendant in view of this is excused and the defendant had the right to terminate the contract in the fashion in which it did.

"The Court also agrees without going into great detail with the defendant's contention concerning commercial frustration and feels that it is not necessary to take up the fourth and final contention, that of breach of contract.

"Insofar as the plaintiff is concerned, the Court does not think it can now come in and assert that it was the obligation of the de-

decision letter indicates that the trial judge was deciding questions of fact regarding breeding time as it related to the contracts between MRI and Y–Tex.

We note that neither of the parties called to the attention of the district court the applicability of the Uniform Commercial Code (U.C.C.).[6] It is readily apparent that act is intended to cover the problems raised in this case and it should be used as applicable.[7] We look at a motion for summary judgment in the same light as the district judge and as though it was originally before us, because we now have the same materials he did upon which to base a decision. *Seay v. Vialpando*, Wyo. 1977, 567 P.2d 285; *Shrum v. Zeltwanger*, Wyo.1977, 559 P.2d 1384. It is not considered a new issue to consider additional relevant authority in the disposition of a case. This does not interfere with the course of the litigation selected by the parties. There is no reason to keep secret the proper law applicable to a case just because overlooked. The trial judge and the parties had available the U.C.C. to the extent applicable. The U.C.C. became a part of the contract as though written into its terms. *Tri-County Electric Association v. City of Gillette*, Wyo.1978, 584 P.2d 995; *Application of Hagood*, Wyo.1960, 356 P.2d 135.

We are also concerned with the propriety of granting a motion for summary judgment under the circumstances considered here. If there is a genuine issue of fact, summary judgment is to be denied. *Seay v. Vialpando*, supra; *Shrum v. Zeltwanger*, supra. Moreover, the propriety of granting a motion for summary judgment depends upon the correctness of the court's dual finding that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. *Johnson v. Soulis*, Wyo.1975, 542 P.2d 867.

As shall be evident from the following discussion, material issues of fact were identified by MRI and additional issues of fact are apparent when the governing statutes are considered. Neither party challenged the validity of the June 21, 1974 exclusive dealing agreement, nor do we. Such an agreement is recognized by the U.C.C.:

§ 34–21–223:

"(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

"*(2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the*

fendant upon receipt of the cancellation orders to go out and search for new customers. The Court finds nothing in any of the pleadings, the depositions or the affidavits that would so indicate this was defendant's obligation, and, in fact, it is the opinion of the Court that quite the contrary was intended and agreed upon by both parties. Additionally, since the semen could be used only during breeding time, a fact known to both parties, it would appear to the Court that such an attempt to secure new customers would have been nothing but an exercise in futility on the part of the defendant. * * *"

6. §§ 34–21–101 to 34–21–1002, W.S.1977; Articles I, General Provisions, and II, Sales, contain the provisions which govern this action, §§ 34–21–102—34–21–128, and §§ 34–21–201 —34–21–299.5, W.S.1977. Other provisions

may be applicable as well. This opinion is not intended to exhaustively discuss all applicable provisions of the U.C.C. These statutory provisions are made applicable by the language of § 34–21–105, W.S.1977, providing that they apply to transactions bearing an appropriate relation to this state. See *Park County Implement Co. v. Craig*, Wyo.1964, 397 P.2d 800.

7. § 34–21–102(b), W.S.1977:
"(b) Underlying purposes and policies of this act are:
"(i) To simplify, clarify and modernize the law governing commercial transactions;
"(ii) To permit the continued expansion of commercial practices through custom usage and agreement of the parties;
"(iii) To make uniform the law among the various jurisdictions."

*goods and by the buyer to use best efforts to promote their sale."* (Emphasis added.)

■ This section creates an inherent question of fact which plaintiff could rightfully present to the trier of fact.[8] As long as the June 21, 1974 agreement was in force, MRI was entitled to good faith performance by Y–Tex.[9] See, Uniform Laws Annotated, Uniform Commercial Code, Vol. 1, § 2–306, official comment 5; *Feld v. Henry S. Levy & Sons, Inc.,* 1975, 37 N.Y.2d 466, 373 N.Y.S.2d 102, 105, 335 N.E.2d 320, 323.

Of equal importance is the ambiguity present on the face of the July 14, 1975 termination agreement. The letter recites that the agreement was reached by telephone conversations. That it may not have been intended to be a complete statement of the parties' agreement to terminate their June 21, 1974 agreement appears clearly in the letter: "If this *substantially* outlines our agreement * * *." (Emphasis added.)[10] The defendant, Y–Tex, in the memorandum filed with its motion for summary judgment, and in its brief here, repeatedly refers to an oral agreement. The letter agreement contains no clause to the effect that it incorporates all the agreement of the parties. Additionally, we see an ambiguity in the language of paragraphs "1" and "2" of the letter agreement. From paragraph "1", it can be gleaned that perhaps there was only an agreement to fill orders obtained by Y–Tex and it might be implied that if an order was cancelled, there was no order

to be filled. That conclusion is somewhat shaky, however. On the other hand, paragraph numbered "2" can be construed to be Y–Tex's order for 12,901 semen units in accordance with the original formal agreement of the earlier date. In both paragraphs reference is made to the original contract and it was not to terminate until the "12,901 semen unit order has been filled." The affidavit of MRI's president in opposition to the motion for summary judgment alleges Y–Tex refused to disclose the orders or their terms. The "order" has not been filled, though the record discloses representations of MRI as to its willingness and ability to do so. The question would then seem to logically arise, has there been a breach of the original contract? For some reason MRI takes the position that the original contract is a nullity. We do not see how that is possible in the light of the language used which effects termination upon fulfillment of a condition. However that may be, MRI only seeks by its amended complaint various damages arising out of loss of the sale of the 12,901 semen units.

■ The meaning of the July 14, 1975 termination agreement is disputed by the parties. It is ambiguous on its face and the June 21, 1974 agreement does little to help in fully explaining its meaning. MRI claims that the termination letter is an order for 12,901 units of semen. On its face it appears to be just that, even in view of its failure to state that Y–Tex promised to buy the semen.[11] Y–Tex claims it is only a

---

8. A jury demand was made in this case.

9. § 34–21–122, W.S.1977:
   "Every contract or duty within this act [§§ 34–21–101 to 34–21–1002] imposes an obligation of good faith in its performance or enforcement."
   Section 34–21–120 sets out general definitions of terms used in the U.C.C.
   "(xix) 'Good faith' means honesty in fact in the conduct or transaction concerned;"

10. MRI conceded that all the terms of the agreement were present and they could not now attempt to prove a missing term. However, the whole thrust of their argument is to the effect that the letter agreement should be read in the light of the 'substantially outlines our agreement' language and that, in fact, the

oral agreement was that Y–Tex had agreed to buy the semen.

11. § 34–21–209, W.S.1977:
   "(a) Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
   "(i) By course of dealing or usage of trade (section 1–205 [§ 34–21–212]) or by course of performance (section 2–208 [§ 34–21–215]); and

reservation. The document recites there may be more to the agreement than what appears in the letter. If there is *any* doubt as to the meaning of a written instrument, there arises an issue of fact to be litigated and summary judgment is inappropriate. *Fulton v. Clark*, 1975, 167 Mont. 399, 538 P.2d 1371, 1374; *Robert v. E. C. Milstead Ranching, Inc.*, Tex.Civ.App.1971, 469 S.W.2d 429, 431; *Westchester Fire Ins. Co. v. In-Sink-Erator*, Fla.App.1971, 252 So.2d 856, 858; *Brooks v. Renner and Company*, 1967, 243 Ark. 226, 419 S.W.2d 305, 306–307. The record contains evidence which indicates it was MRI's understanding and intent that it would sell the first 12,901 units of semen it produced to Y–Tex. In addition, it is apparent from the record that, based on that understanding, MRI did not pursue additional customers for semen during 1975. Y–Tex understood, and apparently intended the July 14, 1975 agreement to be only a reservation of 12,901 units of semen which it could or could not buy at its will. The July 14, 1975 letter does not resolve this question nor can it be resolved simply by referring to the June 21, 1974 agreement. There is no language clearly stating that a reservation was intended. The agreement might be a contract to sell "future goods." § 34–21–205, W.S.1977. MRI is entitled to have the ambiguity in the agreement as well as the parties' intentions resolved by the trier of fact. An ambiguous contract is one capable of being understood in more ways than one. It is an agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present. If a contract is ambiguous, parol evidence is admissible to explain its meaning. *Bulis v. Wells*, Wyo.1977, 565 P.2d 487. The formal summary judgment should be granted only

where it is clear that no issue of material fact is involved and where inquiry into the facts is not desirable to clarify the application of the law. *Johnson v. Soulis*, supra. Provisions of the U.C.C. provide a means to assist in resolving the issues of fact presented. We shall not attempt to outline the applicable provisions in detail (beyond those already cited), but will rather leave that to the parties to develop out of the evidence in the adversary mode.

■ The district court also premised its disposition of this case on Y–Tex's claim that impossibility of performance and commercial frustration excused any performance that may have been required of them under the July 14, 1975 letter. This matter is also addressed by the U.C.C. See § 34–21–278, W.S.1977 (§ 2–615, U.C.C.); Anderson, Uniform Commercial Code, §§ 2–615:12, et seq. in his discussion of impossibility and frustration and their relationship to the U.C.C., and, in particular, the late cases cited in the November 1978 pocket part dealing with impossibility cited under §§ 22–615:12, et seq., at pages 58, et seq. The trial court relied heavily on eighteen affidavits filed with the motion for summary judgment that indicated the orders for semen which Y–Tex held were cancelled because a breeding season had passed. But, the record is also replete with the opposing affidavit of the president of MRI and other testimony which showed the orders were only to be filled as soon as possible. Furthermore, the affidavits do not uniformly state that cancellation was the result of the passing of a breeding season. Moreover, the record does not support a finding that MRI knew that the order placed by Y–Tex was for a particular breeding season or

"(ii) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

§ 34–21–211, W.S.1977:

"(a) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

"(b) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

"(c) Even though one (1) or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

seasons or that the order had to be filled by any particular time, nor does that appear in the termination agreement. Mr. Image did produce semen at a fairly predictable rate and from this information both parties could have estimated the amount of time it would take to produce 12,901 units of semen. In addition, the testimony raises a question of whether the reason for cancellation was due only to a general depression in the market for cattle. Not only is there a question of fact presented, but the issue of impossibility of performance is a question normally most suitable for determination by the trier of fact. See, Calamari and Perillo, Contracts, § 13–1, No. 7, page 477, 2nd Ed. (1977); Uniform Laws Annotated, Uniform Commercial Code, § 2–615, official comment 9 and notes of decision 2 and 13. No part of this opinion should be construed as deciding any questions of fact. We hold only that there are questions of fact to be decided before a true construction of the termination agreement can be reached.

Reversed and remanded for trial.

## ORDER DENYING PETITION FOR REHEARING

### FOR THE COURT.*

The court having closely examined appellee's petition for rehearing along with its opinion, handed down herein on February 8, 1979, and being of the view that all points now raised in the petition were then carefully and fully weighed by the court and rejected in our prior disposition because the issue of breach of contract was not considered by the lower court for the readily apparent reason that the issue of breach was so plainly disputed on material issues of fact and because matters of breach could not be further decided by us in view of our determination that disputed matters concerning the contract itself must first be decided by the trier of fact, even though there may be parts of the contract which are not in controversy, it is

ORDERED that the appellee's petition for rehearing be, and it is, denied.

---

* Before RAPER, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and GUTHRIE, J., Retired. ROONEY, J., did not participate.