Cooke, J.
Plaintiff operates a business known as the Crushed Toast Company and defendant is engaged in the wholesale bread baking business. They entered into a written contract, as of June 19, 1968, in which defendant agreed to sell and plaintiff to purchase "all bread crumbs produced by the Seller in its factory at 115 Thames Street, Brooklyn, New York, during the period commencing June 19, 1968, and terminating June 18, 1969”, the agreement to "be deemed automatically renewed thereafter for successive renewal periods of one year” with the right to either party to cancel by giving not less than six months notice to the other by certified mail. No notice of cancellation was served. Additionally, pursuant to a contract stipulation, a faithful performance bond was delivered by plaintiff at the inception of the contractual relationship, and a bond continuation certificate was later submitted for the yearly term commencing June 19, 1969.
Interestingly, the term "bread crumbs” does not refer to crumbs that may flake off bread; rather, they are a manufactured item, starting with stale or imperfectly appearing loaves and followed by removal of labels, processing through two grinders, the second of which effects a finer granulation, insertion into a drum in an oven for toasting and, finally, bagging of the finished product.
Subsequent to the making of the agreement, a substantial quantity of bread crumbs, said to be over 250 tons, were sold by defendant to plaintiff but defendant stopped crumb production on about May 15, 1969. There was proof by defendant’s comptroller that the oven was too large to accommodate the drum, that it was stated that the operation was "very uneconomical”, but after said date of cessation no steps were taken to obtain more economical equipment. The toasting oven was *469 intentionally broken down, then partially rebuilt, then completely dismantled in the summer of 1969 and, thereafter, defendant used the space for a computer room. It appears, without dispute, that defendant indicated to plaintiff at different times that the former would resume bread crumb production if the contract price of 6 cents per pound be changed to 7 cents, and also that, after the crumb making machinery was dismantled, defendant sold the raw materials used in making crumbs to animal food manufacturers.
Special Term denied plaintiff’s motion for summary judgment on the issue of liability and turned down defendant’s counter-request for a summary judgment of dismissal. From the Appellate Division’s order of affirmance, by a divided court, both parties appeal.
Defendant contends that the contract did not require defendant to manufacture bread crumbs, but merely to sell those it did, and, since none were produced after the demise of the oven, there was no duty to then deliver and, consequently from then on, no liability on its part. Agreements to sell all the goods or services a party may produce or perform to another party are commonly referred to as "output” contracts, and they usually serve a useful commercial purpose in minimizing the burdens of product marketing (see 1 Williston, Contracts [3d ed], § 104A). The Uniform Commercial Code rejects the ideas that an output contract is lacking in mutuality or that it is unenforceable because of indefiniteness in that a quantity for the term is not specified (6 Encyclopedia New York Law, Contracts, § 442, 1974-1975 Supp by Professor Schwartz, p 43). Official Comment 2 to section 2-306 (McKinney’s Cons Laws of NY, Book 62 Vi, Uniform Commercial Code, pp 206-207) states in part: "Under this Article, a contract for output * * * is not too indefinite since it is held to mean the actual good faith output * * * of the particular party. Nor does such a contract lack mutuality of obligation since, under this section, the party who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output * * * will approximate a reasonably foreseeable figure.” (See, also, Matter of United Cigar Stores Co. of Amer., 8 F Supp 243, 244, affd 72 F2d 673, cert den sub nom. Consolidated Dairy Prods. Co. v Irving Trust Co., 293 US 617; 9 NY Jur, Contracts, § 10, p 531.)
The real issue in this case is whether the agreement carries *470 with it an implication that defendant was obligated to continue to manufacture bread crumbs for the full term. Section 2-306 of the Uniform Commercial Code, entitled "Output, Requirements and Exclusive Dealings” provides:
"(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.
"(2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.” (Emphasis supplied.)
The Official Comment thereunder reads in part: "Subsection (2), on exclusive dealing, makes explicit the commercial rule embodied in this Act under which the parties to such contracts are held to have impliedly, even when not expressly, bound themselves to use reasonable diligence as well as good faith in their performance of the contract. * * * An exclusive dealing agreement brings into play all of the good faith aspects of the output and requirement problems of subsection (1). It also raises questions of insecurity and right to adequate assurance under this Article.”
Section 2-306 is consistent with prior New York case law (Buerger and O’Connor, Practice Commentaries, McKinney’s Cons Laws of NY, Book 62½, Uniform Commercial Code, § 2-306, p 206). Every contract of this type imposes an obligation of good faith in its performance (Uniform Commercial Code, § 1-203; see Wigand v Bachmann-Bechtel Brewing Co., 222 NY 272, 277; New York Cent. Iron Works Co. v United States Radiator Co., 174 NY 331, 335). Under the Uniform Commercial Code, the commercial background and intent must be read into the language of any agreement and good faith is demanded in the performance of that agreement (Official Comment 1, McKinney’s Cons Laws of NY, Book 62½, Uniform Commercial Code, § 2-306), and, under the decisions relating to output contracts, it is clearly the general rule that good faith cessation of production terminates any further obligations thereunder and excuses further performance by the party discontinuing production (Du Boff v Matam Corp., *471 272 App Div 502; HML Corp. v General Foods Corp., 365 F2d 77, 83 [applying New York law]; Matter of United Cigar Stores Co. of Amer., supra; see Neofotistos v Harvard Brewing Co., 341 Mass 684; 6 Encyclopedia New York Law, Contracts, § 442, 1974-1975 Supp by Professor Schwartz, p 44).
This is not a situation where defendant ceased its main operation of bread baking (see Neofotistos v Harvard Brewing Co., supra). Rather, defendant contends in a conclusory fashion that it was "uneconomical” or "economically not feasible” for it to continue to make bread crumbs. Although plaintiff observed in his motion papers that defendant claimed it was not economically feasible to make the crumbs, plaintiff did not admit that as a fact. In any event, "economic feasibility”, an expression subject to many interpretations, would not be a precise or reliable test.
There are present here intertwined questions of fact, whether defendant performed in good faith and whether it stopped its manufacture of bread crumbs in good faith, neither of which can be resolved properly on this record. The seller’s duty to remain in crumb production is a matter calling for a close scrutiny of its motives (1 Hawkland, A Transactional Guide to the Uniform Commercial Code, p 52, see, also, p 48), confined here by the papers to financial reasons. It is undisputed that defendant leveled its crumb making machinery only after plaintiff refused to agree to a price higher than that specified in the agreement and that it then sold the raw materials to manufacturers of animal food. There are before us no componential figures indicating the actual cost of the finished bread crumbs to defendant, statements as to the profits derived or the losses sustained, or data specifying the net or gross return realized from the animal food transactions.
The parties by their contract gave the right of cancellation to either by providing for a six months’ notice to the other. The apparent purpose of such a stipulation was to provide an opportunity to either the seller or buyer to conclude their dealings in the event that the transactions were not as profitable or advantageous as desired or expected, or for any other reason. Correspondingly, such a notice would also furnish the receiver of it a chance to secure another outlet or source of supply, as the case might be. Short of such a cancellation, defendant was expected to continue to perform in good faith and could cease production of the bread crumbs, a single facet of its operation, only in good faith. Obviously, a bankruptcy or *472 genuine imperiling of the very existence of its entire business caused by the production of the crumbs would warrant cessation of production of that item; the yield of less profit from its sale than expected would not. Since bread crumbs were but a part of defendant’s enterprise and since there was a contractual right of cancellation, good faith required continued production until cancellation, even if there be no profit. In circumstances such as these and without more, defendant would be justified, in good faith, in ceasing production of the single item prior to cancellation only if its losses from continuance would be more than trivial, which, overall, is a question of fact.
The order of the Appellate Division should be affirmed, without costs.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
Order affirmed, without costs. Question certified answered in the affirmative.