# Paramount Lithographic Plate Service, Inc.
## v. Hughes Printing Company

*Stephen M. Feldman,* for plaintiffs.
*Morris R. Brooke,* for defendant.

FORER, *J.,* January 13, 1977 — Paramount Lithographic Plate Service, Inc. and John J. Seader and Paul V. Cusick, individually and as copartners trading as Craftsmen Service Lithographers[1], brought an action in assumpsit against Hughes Printing Company of Stroudsburg, Pennsylvania for violation of a requirements contract entered into by plaintiff corporation and defendant on October 20, 1967. Defendant Hughes was a subsidiary of Printing Corp. of America (PCA). Pursuant to contract, plaintiff was to supply all of Hughes requirements for lithographic plates for a period of two years and for successive two year periods thereafter unless notice to the contrary was given.[2]

---

1. It was agreed by counsel that the relationships between plaintiffs were immaterial for the purposes of this litigation and that any verdict would be rendered for the plaintiffs without differentiation.

2. The contract was in the form of a letter set forth as follows: "This letter is to forulate [sic] the lattest [sic] and only agreement between Paramount Lithographic Plate Service or it's subsidiary and Hughes Printing Company. Paramount will be referred to as "SUPPLIER" and Hughes Printing will be referred to as "CUSTOMER". It has been agreed that:

"1. The supplier is to make within an 8 hour period offset plates and negatives from crona press conversions, 3M scotchprints or original art work.

"2. The supplier is to provide 3 shifts provided the customer has the work to be turned out. Until such time as 3 shifts are required, supplier agrees that a standby crew for emergency work during night hours will be provided.

Defendant, which had been in business for many years, decided to change its operations to offset printing and purchased a large offset web press for its Stroudsburg plant. The contract contemplated that plaintiffs would supply the lithographic plates for this press. Plaintiffs rented premises from defendant, purchased supplies and moved personnel to Stroudsburg in order to carry out the terms of the contract. The individual plaintiffs, who were residents of the Philadelphia area, spent considerable time in Stroudsburg readying their plant for operations. The press arrived in Stroudsburg in November, 1967. Within weeks, discussions were had by executives of PCA looking toward moving the press. It was in partial operation from February, 1968, until June, 1968, when it was moved to the plant of another subsidiary of PCA located in Hildreth, Connecticut. Accordingly, defendant had no further requirement for any lithographic plates. Plaintiffs sued for loss of profits alleging bad faith on the part of defendant.

The case was tried for five days, May 10 to 14,

---

"3. Supplier is to be exclusive supplier as long as he can meet customer schedule requirements.

"4. Contract shall run for two years and every two years consecutively unless written notice is given 90 days prior to contract renewal of following years.

"5. Prices will normally be reviewed on a yearly basis except where there has been an unusual increase in the cost of Lithographic supplies.

"6. The prices for all Printing Corporation of America's subsidiaries will be the same except where the conditions set forth in our covering letter are not met or where type of supplies used differ.

This agreement when signed by an officer of our company and an officer of your company shall constitute a contract binding on both parties and shall be the only contract between us."

1976, before a jury which returned a verdict in favor of plaintiffs in the amount of $151,634 which included simple interest at 6 percent.[3]

Defendant filed motions for new trial, judgment n.o.v., and for a reduction of the verdict. Upon consideration of comprehensive briefs and extensive oral argument, all motions were denied on December 1, 1976.[4]

Two issues were raised by defendant's exceptions:

1. The propriety of the court's instructions on "good faith," and, 2. the appropriate measure of damages and the adequacy of plaintiff's proof of lost profits.

The evidence disclosed that in 1967 defendant did all of its printing by letterpress method, which did not require the use of lithographic plates. However, in 1967, in recognition of a trend in the industry toward offset printing, defendant decided to change its operations and accordingly ordered a large offset web press for installation in its plant in Stroudsburg, Pennsylvania. Concurrently, defendant entered into negotiations with plaintiffs which led to the signing of the November 21, 1967, contract (set forth, supra, fn. 2). Plaintiffs were at

---

3. It can be presumed that the jury awarded $108,000 damages and $42,400 interest.

4. No request for binding instruction was made. Where no such request has been made, it is indisputably the rule that a judgment NOV may not be granted: Essex Packers Limited v. Kisecker, 373 Pa. 351, 357-358, 95 A.2d 544 (1953); Dora v. Dora, 392 Pa. 433, 141 A.2d 587 (1958); Falgiatore v. Falgiatore, 378 Pa. 586, 588, 107 A.2d 864 (1954). Moreover, assuming that defendant's points for charge could be construed as a request for binding instructions, there is no ground for granting either a new trial or judgment n.o.v.

the time engaged in lithographic work in Philadelphia and had performed work for Periodical Press, another subsidiary of PCA. Defendant Hughes Printing Corporation was at the time of entering into the contract a subsidiary of PCA.[5] Shortly thereafter, in January, 1968, PCA was acquired by American Can Company and was operated as a division of the parent corporation. Defendant ceased having board of directors meetings and was simply told what to do by an employe of PCA.

Defendant built expensive and elaborate facilities to accommodate the new press, and in November of 1967, the press was delivered to defendant's plant where it was put into operation in February, 1968.

In order to fulfill their obligation under the contract, plaintiffs entered into a two year lease with defendant for premises next to defendant's plant to be used in connection with making the lithographic plates. Plaintiffs expended considerable time, effort and expense constructing necessary facilities to prepare the building for its contemplated operations.

At the time that the offset press was put into operation in February, 1968, at defendant's plant, defendant published as many as 125 magazines monthly. Defendant had no sales department but utilized the sales force of the parent Printing Corporation of America which also made sales for its other subsidiaries.

The offset press never went into full operation. Little, if any, effort was made to run the work of

---

5. PCA was formed in 1961 when three printing corporations merged. The three consisted of the Hughes Corporation, Publishers Printing Company, and another smaller printing concern.

the 125 publications which defendant published on the new press although the work from those publications could conceivably have filled the time on the press. The sales department of PCA did not cooperate in sending new work for the press in Stroudsburg. In March, 1968, discussions began with regard to the removal of the press. These discussions continued until the final decision to remove the press from defendant's plant was made on May 29, 1968.

In June, 1968, the press was, in fact, removed to the plant of another PCA subsidiary, Hildreth Press in Bristol, Connecticut. Operation of the press began at Hildreth in September, 1968, and the lithographic plates for the press were made by Hildreth itself.[6] Some of the work of defendant's customers was transferred to Hildreth and was done on the press that had formerly been at defendant's plant. During the months that plaintiffs were working in Stroudsburg on defendant's premises, defendant did not advise them of the discussions concerning removal of the press. In April, 1968, when plaintiff Seader confronted defendant with a newspaper report that the press might be moved, he was assured by defendant's president that there was nothing to be concerned about, that things were going to go on as they had planned, that the press was going to roll and that plaintiffs should keep themselves available to complete their end of the contract. Plaintiffs were not even informed of the final decision to move the press, but learned about it only from the newspaper. Both

6. Hildreth Press acquired plate making facilities when it merged with Domonel Press. The plates were made at Hildreth by Hildreth employees.

parties agree that the primary question is whether the defendant acted in good faith (as defined under the Uniform Commercial Code). The court so charged the jury quoting from the Act of April 6, 1953, P.L. 3, as amended, 12A P.S. §§1-201(19), 2-306(1):

"Definition of good faith is honesty of intention, an honest intention to abstain from taking any unconscientious advantage of another even though technicalities of law together with absence of all information, notice or benefit of facts which render the transaction unconscionable under the statute involved here. Good faith is defined as follows: Good faith means honesty in fact in the conduct or transaction concerned. Good faith is required of a party to a requirements contract. Its required of both parties."

There are no Pennsylvania cases directly in point. The court, therefore, relied upon cases from other jurisdictions to enlarge, explain and illustrate for the jury the meaning of "good faith" under the Uniform Commercial Code. Both parties took numerous exceptions to various portions of the charge.

Defendant asserts that the seller has the burden of proving that the buyer did not act in good faith, citing HML Corporation v. General Foods Corp., 365 F.2d 77, 83 (3d Cir. 1966). The court so charged. Moreover, the jury was charged that "the seller assumes the risk that the buyer make a decision which results in buyer's having no further need for the goods." See N.T. 577 where this rule was clearly stated three times.

Defendant also objects to the following portion of the charge which, it is asserted, imposed a greater

obligation on defendant than is required by the Uniform Commercial Code:

"A determination in a contract which measures the quantity of a product which is to be purchased by the requirements of the buyer means such actual requirements as may occur in good faith. Under the law, an obligation was imposed on the defendant to use its best efforts to promote the sale of offset printing and thus to promote the requirement for the lithographic plates."

It is defendant's position that if buyer's motive for discontinuing a particular operation is to improve profitability, then he acts in good faith. It is, therefore, urged that the reference to defendant's obligation to use its "best efforts" to promote the sale of offset printing was erroneous. However, this portion of the charge cannot be viewed in isolation, for it is but a gloss on the definition of good faith as explained in the preceding and subsequent portions of the charge. Viewed in context, it explains one of the numerous aspects of the concept of good faith and does not set forth a separate requirement. Moreover, this portion of the charge was abstracted from the recent case of Feld v. Henry S. Levy & Sons, Inc., 37 N.Y.2d 466, 373 N.Y.Supp.2d 102, 335 N.E.2d 320 (1975), in which the New York Court of Appeals held that a mere reduction in profits by an output seller was not sufficient ground under UCC section 2-306 for the seller to discontinue having output. In that case, defendant was engaged in the wholesale bread baking business and had entered into an output contract with plaintiff in which it agreed to sell plaintiff and plaintiff agreed to purchase all the bread crumbs produced by defendant at its factory during a specified period. Because the bread crumb

production was "very uneconomical" defendant ceased production. In affirming the denial of defendant's motion for summary judgment, the Court of Appeals held:

"This is not a situation wheere defendant ceased it smain operation of bread baking. [Citation] Rather, defendant contends in a conclusory fashion that it was 'uneconomical' or 'economically not feasbile' for it to continue making bread crumbs . .

In any event, 'economic feasibility', an expression subject to many interpretations, would not be a precise or reliable test.

"There are present here intertwined questions of fact, whether defendant performed in good faith and whether it stopped its manufacture of bread crumbs in good faith, neither of which can be resolved properly on this record. The seller's duty to remain in crumb production is a matter calling for a close scrutiny of its motives. [Citation]

". . . Obviously, a bankruptcy or genuine imperiling of the very existence of its entire business caused by the production of the crumbs would warrant cessation of production of that item; the yield of less profit from its sale than expected would not. Since the bread crumbs were but part of defendant's enterprise and since there was a contractual right of cancellation, good faith required continued production until cancellation, even if there be no profit. In circumstances such as these and without more, defendant would be justified, in good faith, in ceasing production of the single item prior to cancellation only if its losses from continuance would be more than trivial, which overall is a question of fact." 37 N.Y.2d 471, 472, 373 N.Y.Supp.2d 105-6.

In the instant case there was no evidence in the

record that defendant was in any financial peril, or that it had lost money on the operation of the web press located at Stroudsburg.

Defendant also cites Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp., 130 F.2d 471 (3d Cir. 1942), for the proposition that a decision to cease operations to improve profitability is a good faith reason for the buyer ceasing to purchase under a requirements contract. In the cited case, the buyer had been in operation under the contract for sixteen years. Drastic changes in economic and labor conditions resulted in a marked loss of business. The trial court found as a fact that the decision to close the plant was not for the purpose of avoiding any obligation under the contract, "or to divert the business of the Connellsville plant to other plants controlled by the parent corporation." at pp. 473-4. This, of course, was precisely the crucial factual issue to be decided in the case at bar. This question of whether the decision to move the press was made in good faith was submitted to the jury as follows:

"In deciding whether the decision to move the press was made in good faith, as I have defined it, you must consider whether the decision was made in order to avoid the obligation to the plaintiffs or to divert business to the Hildreth plant in Connecticut, and to discontinue offset printing in Stroudsburg."

In addition, the court, over the objections of plaintiff, instructed the jury that the buyer could in good faith make a decision which eliminates the need for the seller's product:

"The changes in the buyer's needs may come about as a result of a situation made by the buyer himself. The law provides that if the buyer in good

faith makes a decision which results in having no further need for the goods, the buyer is not obligated to buy any more of the goods.

"For example, if a contract is made under which a buyer agrees to buy his requirements of coal for use in his iron mill, and the buyer subsequently decides in good faith to stop using coal and start using natural gas, the buyer is not obligated under the law to buy any more coal from the seller." See McKeever, Cook & Co. v. Cannonsburg Iron Co., 138 Pa. 184 (1888, 1890).

Defendant relies heavily on the distinction between a requirements contract and an exclusive dealings contract. The contract in the case at bar is admittedly a requirements contract. But by its terms it is also an exclusive dealings contract in which the plaintiff was to be the exclusive supplier. Section three of the contract clearly states "supplier is to be exclusive supplier as long as he can meet customer schedule requirements." The question of exclusive dealing arises most commonly when there is an allegation of restraint of trade, but not necessarily so. Requirements contracts may also involve exclusive dealings. "The output and requirements contracts by their very nature necessitate an exclusive dealing of some sort, be it all of the output sold to one party or all of the needs of someone supplied by one producer:" Williston on Sales, §10-4, 389 (4th ed. 1973). In the instant case, plaintiff's entire operation in Stroudsburg was set up *solely* for the purpose of supplying defendant with lithographic plates. No other work was contemplated other than that for defendant Hughes. Comment five of section 2-306 of the UCC sets forth the requirement that under such circumstances the buyer must "use reason-

able effort and due diligence in the expansion of the market or the promotion of the product, as the case may be." This language was adopted in the Court's charge.

Defendant claims nevertheless that the contract was not an "exclusive dealings" contract as described in UCC section 2-306(2) and that there was no obligation on the part of defendant to "use due diligence" or its "best efforts" to promote the sale of defendant's printing services and thus create a need for the lithographic plates as was contemplated by the contract. Defendant asserts that there was no evidence of bad faith in removing the press and that it was moved only because it was unprofitable for Hughes and its parent PCA to continue operation of the offset press at Stroudsburg.

The difficulty with defendant's position is that it failed to produce evidence to show that it was in fact unprofitable to operate the press at the Hughes plant in Stroudsburg. Indeed, directors of defendant and those closely associated with defendant testified that they were opposed to the decision to move the press which, in their opinion, was harmful to the interests of defendant. Mr. Carl Hughes, who had been associated with defendant for approximately 38 years and who was president of the company at the time the decision was made, testified on both direct and cross-examination that he thought that the press should have remained in Stroudsburg. He was also of the opinion that the total operation of the press had not been given a fair chance. Mr. Russell Hughes, a founder of defendant and former chairman of the board of PCA testified that when the contract with plaintiffs was entered into it was contemplated that the offset press would remain in Stroudsburg for many

years. The new building and land to house the press had cost defendant more than $800,000. He also testified that he was a member of the management committee of PCA after it had merged with American Can and that in this capacity he had taken part in discussions relating to the removal of the press. He disagreed with the decision to move the press to Hildreth.[7]

In addition, defendant's own witness, John Gantz, who was another member of the management committee of PCA, testified that when PCA had decided to go into offset printing it purchased a total of four presses, one for the Hughes plant, one for Hildreth in Connecticut, and two for Periodical Press, another subsidiary of PCA. Apparently in February, 1968, as a result of alleged[8] declining profits at Hughes and other PCA subsidiaries and because of alleged difficulties in training employees at Hughes to run the new press, PCA considered as one possible option closing the Hughes plant and moving the Hughes press to Hildreth in Connecticut. However, Mr. Gantz testified that he has no personal knowledge of any problems at the Hughes plant. He further testified that there was competition within the parent PCA between the representatives of the Hughes group and the Publisher's Company group

---

7. It should be noted that while Russell Hughes had been chairman of the Board of PCA, he retired when PCA was acquired by American Can in January, 1968. Although he remained on the management committee of PCA as an advisor or consultant, he had "no weight" with the other committee members because of his retirement.

8. Defendant never produced any evidence of declining profits or difficulties in production. Its sole witness, Mr. Gantz, based his testimony on hearsay, rumor and belief.

stemming from old loyalties which remained from the days prior to 1962 when the two groups merged to form PCA. Gantz further testified that on May 29, 1968, when PCA division of American Can decided to move the press from Stroudsburg to Hildreth, no one from defendant Hughes Printing Company was on the committee which made the final decision.

It does not strain credulity, nor would it have been unreasonable for the jury to conclude that the press was moved to benefit the old Publisher's Printing faction of PCA at the expense of the Hughes plant.

Aside from the aforementioned testimony of Mr. Gantz, there was no evidence that Hughes was in financial distress or that sound business judgment dictated the removal of the press less than five months after it was purchased.

Defendant argues that there was no evidence as to defendant's motives which could constitute bad faith and that there was no evidence that defendant intended to divert business away from Hughes. Cf. Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp., supra. No defense witness other than Gantz gave any explanation for the sudden decision to move the press. Significantly, the work which plaintiffs would have performed was, as a result of moving the press, performed by other subsidiaries of PCA. There was no testimony on the part of defendant to indicate any good faith effort to carry out the contract with plaintiffs, or even that all of the decision makers were aware of this obligation. Mr. Gantz testified that he himself was aware that a contract existed with plaintiffs, but that it was never discussed during all of the meetings which led to the decision to remove the

press.. Nor was there any hard evidence as to the financial condition of defendant, its lack of business or any other valid reason for discontinuing operations.

Plaintiffs obviously could not prove by direct testimony of officials of defendant what their intentions were in moving the press. They presented evidence of the actions of defendant with respect to the circumstances surrounding the contract, the decision to move the press, and the notice to plaintiffs. The jury, on the basis of the evidence available had to decide whether or not defendant acted in good faith. It cannot be said that the inferences which the jury obviously drew were without substantial evidentiary basis.

A requirements contract, like any other contract, requires the parties to carry out its provisions as anticipated in good faith. Unless there is good faith and an appropriate effort on the part of the seller, the buyer's contract is meaningless. Whether this good faith effort to carry out the terms of the contract is to be phrased as "due diligence" is a semantic quibble. Clearly, a buyer cannot enter into a contract, induce the seller in reliance thereon to expend money and change his position, and then without ever endeavoring to perform, abandon the project. The Uniform Commercial Code requires a good faith effort to carry out the contract. This is the law of Pennsylvania irrespective of the explicit requirements of the UCC cases[9].

---

9. This requirement of good faith is a fundamental principle of contract law. See 17 Am.Jur.2d §256; C. H. Codding & Sons v. Armour & Co., 404 F.2d 1 (10th Cir. 1968); Voege v. American Sumatra Tobacco Corp., 241 F.Supp. 369 (D.Del.1965); Baker v. Chock Full O'Nuts Corp., 292 N.Y.Supp.2d 58 (1968); Lowe v. Feldman, 168 N.Y.Supp.2d

Reading the charge on good faith as a whole and in context, it is clear that the jury was fairly instructed as to the rights and obligations of the parties: McCay v. Phila. Electric Co., 447 Pa. 490, 291 A.2d 759 (1972); Brennan v. St. Luke's Hospital, 446 Pa. 339, 344, 285 A.2d 471 (1971); Incollingo v. Ewing, 444 Pa. 263, 282 A.2d 206 (1971); Mount v. Bulifant, 438 Pa. 265, 270, 265 A.2d 627 (1970); Whitner v. Lojeski, 437 Pa. 448, 454, 263 A.2d 889 (1970).

Defendant also asserts that plaintiffs failed to prove the amount of their losses and that the verdict was excessive. The court instructed the jury that plaintiff had the burden of proving the amount of the damages and that an award could not be based upon conjecture. Plaintiff requested that the court instruct the jury that damages could be measured by the profits made at the Hildreth plant. The court, however, instructed the jury that plaintiffs could recover only the profits which they would have made if the press had not been moved to Connecticut.

Plaintiffs presented the following evidence on damages: Plaintiffs examined every page of those publications which Hildreth printed from June, 1968 to November, 1969, the period of the contract. The list of publications was obtained from defendant's answers to interrogatories. Not all publications were available. Plaintiffs' figures were therefore based only on a portion of the work done at Hildreth. From this examination, plaintiff determined the number of lithographic plates which would have been necessary to produce those publications, and using the price list in effect at

674 (1957), aff'd 174 N.Y.Supp.2d 949 (1958); Mutual Life Ins. Co. v. Tailored Woman, Inc., 309 N.Y. 248 (1955).

the time calculated that the total price for all the plates used was $1,242,000. Because plaintiffs believed that there were three presses at Hildreth[10], including the press removed from defendant's plant at Stroudsburg, plaintiffs estimated that one third of the business ($414,098.42), would have been done on each press. Plaintiff Seader testified that the costs of labor, materials and utilities to perform this amount of work would have been $212,850, leaving plaintiffs with a net profit of $201,000. The average sales price per plate was estimated to be $79.15, and it was estimated that 4,846 plates were used on the press in question. Defendant's own witness, Gantz, on the other hand, estimated that the number of plates actually used on the press was at the rate of 4,000 per year, or 5,666 during the remainder of the contract period, substantially more than plaintiff's estimate. However, Gantz also testified that the price per plate was only $19.75.

Plaintiff's proof of damages required an inference that if the press had not been moved, defendant Hughes would have received a proportionate share of business performed at Hildreth. In view of the fact that there was central management by PCA and that all work was assigned to subsidiary printing plants, this is not an unreasonable assumption. Defendant suggests that the measure of damages is defendant's requirements, not Hildreth's requirements. The court agrees and so charged the jury. But in view of the intercorporate relationships and the fact that the contract contemplated work for the press which was moved to

---

10. Defendant's witness, Gantz, testified that there was a total of four presses at Hildreth. The issue was left for the jury to resolve.

Hildreth, the amount of work performed on that press is a reasonable estimate of the amount of work which would have been done at Hughes if the press had remained at the Hughes' plant in Stroudsburg.

The applicable measure of damages to be applied to a breach of contract for the sale of goods not yet manufactured is set forth in section 2-708(2) of the Uniform Commercial Code:

"[T]he measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." 12A PS §2-708(2).

See also, C. P. Mayer Brick Co. v. D. J. Kennedy Co., 230 Pa. 98, 79 Atl. 246 (1911); Mitchell v. Baker, 208 Pa. 377, 57 Atl. 760 (1904); Puritan Coke Co. v. Clark, 204 Pa. 556, 54 Atl. 350 (1903). This section is an implementation of the fundamental rule of damages under the Code set forth in section 1-106(1) which states that "[t]he remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . ." 12A P.S. §1-106(1).

Since, as the jury found, defendant breached the contract, it cannot object to the lack of precision in proving damages. Official comment 1 to section 1-106 specifically rejects any doctrine that damages must be calculable with mathematical accuracy and states that: "Compensatory damages are often at best approximate . . . they have to be proved with whatever definiteness and accuracy the facts permit, but no more." Defendant never had the offset press in full operation in

Stroudsburg, so it is impossible to know what its requirements would have been. Because the contract was terminated without ever really being operative, there is no standard of profits under the contract by which losses may be compared. See, e.g., Lambert v. Durallium Products Corp., 364 Pa. 284, 72 A.2d 46 (1950) (cited by defendant). The only available method of proof for plaintiff was a reconstruction of the work which would have been performed on the press if it had not been moved from defendant's plant. Plaintiff's estimate of its costs may also have been faulty but it was not brought out on cross-examination[11]. The jury apparently awarded approximately half of the damages claimed by plaintiff, an indication that the jury recognized weakness in plaintiffs' case. However, the fact that there was imprecision in plaintiffs' proof does not deny them the right to recovery: Osterling v. Frick, 284 Pa. 397, 403-4, 131 Atl. 250 (1925); See also Massachusetts Bonding & Ins. Co. v. Johnston & Harder, Inc., 343 Pa. 270, 22 A.2d 709 (1941); Weinglass v. Gibson, 304 Pa. 203, 155 Atl. 439 (1931).

This court cannot conclude that the jury's verdict is not amply supported by the evidence. The amount of the verdict does not shock the conscience of the court: Flank v. Walker, 398 Pa. 166, 171, 157 A.2d 163 (1960); Stark v. Lehigh Foundries, Inc., 388 Pa. 1, 23, 130 A.2d 123 (1957), and no remittitur was ordered.

---

11. No mention of income taxes, payroll taxes, depreciation, insurance or general overhead was ever made. Defendant's cross-examination of Seader was strictly limited to attacking his method of calculation.