OPINION OF THE COURT
Daniel Palmieri, J.
The motion by the defendant pursuant to CPLR 3212 for summary judgment is granted and the complaint is dismissed.
The cross motion by the plaintiff pursuant to CPLR 3212 for summary judgment and to amend the case caption to reflect the correct name of the defendant is denied in its entirety.
In this breach of contract case the plaintiff Goaltex Corp. alleges in its complaint that on or about October 14, 2009 the parties, both “merchants,” had agreed that plaintiff would sell sneakers to the defendant Association for the Blind and Visu *346 ally Impaired - Goodwill Industries of Rochester, Inc. on condition that Goodwill “complete its purchase of any specially ordered sneakers ordered by Goaltex on behalf of [Goodwill] within one (1) year of Goaltex purchasing the same.” Plaintiff further alleges that this agreement was confirmed in a series of emails between the parties. The plaintiff contends that in reliance on this agreement it had ordered and had taken delivery of these sneakers from its manufacturer, which took approximately one year because of necessary testing, production and shipment. Goodwill then refused to purchase the 4,236 pairs of special order sneakers. Goaltex thus alleges performance of its obligations under the agreement and breach by Goodwill.
On this motion the defendant denies the existence of this agreement. It argues that a long course of dealing between these parties is demonstrated by written purchase orders (sometimes, POs) which indicate completed merchandise sales. They are submitted as exhibits on this motion. All these purchase order sales were admitted by plaintiff pursuant to a notice to admit, and thus are not at issue. Defendant contends they prove that the plaintiffs allegations are contrary to how they actually did business. It also argues that the alleged contract term was fatally indefinite, as it is missing a statement of quantity and price.
In further support of its position, it submits the affidavit of George Klemann, its chief financial officer, who denies the existence of any contract with the plaintiff other than the ones represented by the purchase orders, which as noted are not at issue in the litigation.
In opposition to the motion and in support of its own cross motion, Goaltex submits the affidavit of its president, Robert Grubman. He states that both Goaltex and Goodwill are “merchants” as that term is defined by article 2 of the Uniform Commercial Code notwithstanding Goodwill’s status as a not-for-profit corporation. He asserts that a “one year purchase condition” was agreed to by defendant, under which Goaltex would sell sneakers to defendant on condition that defendant would buy all special order sneakers Goaltex itself had ordered on behalf of Goodwill from its manufacturer within one year of Goaltex’s own purchase of the merchandise. He contends that Goodwill reneged on this agreement because Goodwill would resell the sneakers to another entity, Industries for the Blind of New York State (IBNYS), and had itself suffered the cancellation of its own resale contract by IBNYS. Copies of the deposi *347 tion transcripts of George Klemann and Joyel Bennett, defendant’s director of manufacturing and food service, are also annexed in support of the cross motion and in opposition to the motion.
As to formation of this contract, Grubman states that it had been entered into verbally during a telephone conversation between him and one Rose Correa-Jimenez, Goodwill’s then purchasing manager, and was subsequently confirmed in a series of emails, copies of which are annexed to his affidavit. In reply, both Klemann and Rose Correa-Jimenez, a former employee of Goodwill who acknowledges dealing directly with Grubman, submit affidavits in which they deny the existence of the agreement asserted by the plaintiff.
Generally speaking, to obtain summary judgment it is necessary that the movant establish its claim or defense by the tender of evidentiary proof in admissible form sufficient to warrant the court, as a matter of law, in directing judgment in its favor. (CPLR 3212 [b].) Absent this initial showing, the court should deny the motion, without passing on the sufficiency of the opposing papers. (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985].) If such a prima facie case is made, however, the burden shifts to the non-moving party. To defeat the motion for summary judgment the opposing party must come forward with evidence to demonstrate the existence of a material issue of fact requiring a trial. (CPLR 3212 [b]; see also GTF Mktg. v Colonial Aluminum Sales, 66 NY2d 965 [1985]; Zuckerman v City of New York, 49 NY2d 557 [1980].) The non-moving party must lay bare all of the facts at its disposal regarding the issues raised in the motion. (Mgrditchian v Donato, 141 AD2d 513 [2d Dept 1988].) Conclusory allegations are insufficient (Zuckerman v City of New York), and the defending party must do more than merely parrot the language of the complaint or bill of particulars. There must be evidentiary proof in support of the allegations. (Fleet Credit Corp. v Hutter & Co., 207 AD2d 380 [2d Dept 1994]; Toth v Carver St. Assoc., 191 AD2d 631 [2d Dept 1993].)
Also pertinent is the law of sales. UCC 2-204 (“Formation in General”) provides, in pertinent part, that
“(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract. . . .
“(3) Even though one or more terms are left open a *348 contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.”
UCC 2-202 (“Final Written Expression: Parol or Extrinsic Evidence”) states that
“Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
“(a) by course of dealing or usage of trade (Section 1-205) or by course of performance (Section 2-208); and
“(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.”
UCC 2-206 (“Offer and Acceptance in Formation of Contract”) provides that
“(1) Unless otherwise unambiguously indicated by the language or circumstances
“(a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances;
“(b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming . . . goods.”
UCC 2-207 (“Additional Terms in Acceptance or Confirmation”) provides that
“(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
“(2) The additional terms are to be construed as proposals for addition to the contract. Between *349 merchants such terms become part of the contract unless:
“(a) the offer expressly limits acceptance to the terms of the offer;
“(b) they materially alter it; or
“(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
“(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.”
It should be noted with regard to UCC 2-207 (2) that defendant does not dispute its characterization as a “merchant” by the plaintiff, notwithstanding its not-for-profit status.
UCC 2-208 (“Course of Performance or Practical Construction”) provides in relevant part that
“(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.
“(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (Section 1-205).”
Finally, as the plaintiff is arguing for the existence of a requirements contract, UCC 2-306 (“Output, Requirements and Exclusive Dealings”) comes into play, which provides in relevant part as follows:
“(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may *350 occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.”
In this case the alleged agreement advanced by the plaintiff was made through a combination of telephone conversations and emails, and the latter memorialized the terms. The dates of the emails between Grubman and Correa-Jimenez, which emails are central to plaintiffs case, were October 14, 2009, January 20, 2011, and October 19-20, 2011.
The October 2009 email from Grubman contains information about styles and prices and the ability to provide the merchandise to defendant within 21 days, as well as samples for defendant to consider. It also contains the following statement: “Based on our discussion, we would be willing to work out an arrangement whereby we stock a portion over and above your opening inventory where there is an agreement to use the shoes over a year period.”
There is no responsive email from defendant submitted by the plaintiff.
Defendant thereafter ordered footwear from plaintiff by way of individual, formal purchase orders beginning April 13, 2010. There were certain credits issued and reconciliations of payments made, but it is undisputed that all such orders were filled and paid for upon invoices rendered upon the POs. On January 20, 2011, during the course of the PO ordering, Correa-Jimenez sent an email attaching a list of sizes and quantities that defendant needed immediately, and asked about availability and how soon it could receive the sneakers. She also stated, “Once I have that information we can issue a Purchase Order for the buy (we may want to purchase more of an item if necessary).” It should be noted that a large order, dated August 15, 2011, had a PO number of 94597.
On October 19, 2011, Grubman wrote to Correa-Jimenez, stating, “I am still awaiting a response on the sneakers. They seem to be terribly oversold and are reviewing just what they are able to give us the end of October. I hope to have this information for you in the morning.”
The response from defendant, by Correa-Jimenez, that same day, was “This will effect [sic] the new order (I don’t think I’ve sent yet because we need answer). What we will need to do is close PO 94597 at what ever we can get and then add the difference to the new PO.”
*351 A short time later that day, Grubman sent another email stating, “Fine, my intention though is to buy a full container load so we are stocking for you!”
The next day, October 20, 2011, Correa-Jimenez sent another email which was as follows:
“Are you going to buy all sizes? We noticed that some sizes did not move at all. . . Attached you can find the spreadsheet we created of sold items, so you can get an idea. Our main problem is that the customer has been given waivers for quite some time, so we don’t know what volume that has been purchased from other sources. We asked for a forecast and cannot get one. Do not use this as the final order, since the Backorder quantities we can get will effect [sic] the final outcome.”
Thereafter, orders were placed by defendant under additional POs, from April 17, 2012 through August 22, 2012. There is no dispute that goods were shipped and paid for under these POs. However, the defendant’s ordering slowed and then stopped without making the purchases plaintiff alleges it was bound to make. This action ensued.
The essential elements of a cause of action in breach of contract are the existence of a contract, plaintiffs performance, defendant’s failure to perform, and damages. (See e.g. Kausal v Educational Prods. Info. Exch. Inst., 105 AD3d 909 [2d Dept 2013].) The court finds that the documentary evidence submitted by both plaintiff and defendant demonstrates conclusively that there was no agreement for Goodwill to purchase within one year all the sneakers Goaltex had ordered from its manufacturer for sale to Goodwill.
The October 2009 emails demonstrate only that the parties intended to be the seller (plaintiff) and buyer (defendant) of certain footwear. The statement that plaintiff “would be willing to work out an arrangement whereby we stock a portion over and above your opening inventory where there is an agreement to use the shoes over a year period” does not, standing alone, indicate that defendant had agreed to this arrangement. Nor is there any mention of “special orders” as the basis for such an agreement, as alleged in the complaint.
At best, this statement was one in which plaintiff sought an agreement from defendant to buy merchandise stocked by plaintiff over a year period. It was not confirmation of such an agreement. Thus, Correa-Jimenez’s silence does not amount to *352 assent to this condition. There was no “definite and seasonable expression or acceptance” and certainly no “written confirmation” operating as an acceptance of this term. (UCC 2-207 [1].) Even accepting the parties as merchants, this condition did not become a part of the contract without assent from the defendant because it clearly constituted a material alteration to the purchase orders and following invoices later generated. (UCC 2-207 [2] [b]; Orkal Indus., LLC v Array Connector Corp., 97 AD3d 555 [2d Dept 2012].)
Thus, the only agreement that may be said to have come into being pursuant to UCC 2-204 and 2-206 was memorialized not by these emails, but rather by the purchase orders that followed the 2009 communications between the parties. These POs contain all the terms necessary for the parties to do business, and, as noted, are not at issue. Purchase orders were issued, goods were shipped, invoices were sent by plaintiff, and the goods paid for thereunder. Indeed, Grubman acknowledged at his examination before trial (EBT) that (until the current dispute arose) plaintiff never issued an invoice except in response to a purchase order from defendant. This was clearly the course of performance between the parties.
Given this circumstance, and the absence of any writing from defendant accepting the condition urged by plaintiff, the failure of the plaintiff to present a purchase order to support its invoice for payment for the disputed merchandise is fatal. The other emails presented by the plaintiff in support of its position—for example, the one dated January 20, 2011—were simply inquiries about stock and that defendant intended to order from that stock. It was not a promise to buy all stock ordered specifically for defendant. Such an agreement would fail as being too indefinite to enforce in any event; at best, as it was no more than an agreement to agree on a later purchase. (See JMF Consulting Group II, Inc. v Beverage Mktg. USA, Inc., 97 AD3d 540 [2d Dept 2012].) Even assuming that this was a requirements contract, as urged by plaintiff, the absence of a price term would prevent enforcement—unlike the absence of a precise quantity term, which may not be essential. (See Feld v Levy & Sons, 37 NY2d 466 [1975].)
The court also finds that, pursuant to UCC 2-202, plaintiff cannot make use of the October 2009 discussions, or any other discussions, as they constitute parol or extrinsic evidence which contradict the purchase orders. There is no assertion of some prior course of dealing or performance that might explain or *353 supplement the clear terms of these purchase orders; neither party has pointed to a relationship that existed prior to the October 2009 contacts and the shipments that began thereafter. Further, the alleged agreement to purchase all the sneakers ordered from Goaltex’s manufacturer for Goodwill is not a “consistent” additional term.
The October 2011 emails—two years after the alleged condition was made—do nothing to change the foregoing findings. Grubman describes his intention to order a “full container load” in response to Correa-Jimenez’s statements. She had spoken about “what ever we can get” under an existing PO, but she had also stated that she would close the existing purchase order and open another and add missing merchandise to the next one. Her statement thus was wholly consistent with the course of performance between the parties, in which defendant would order specific footwear and plaintiff would then ship the same and be paid for it. Moreover, Correa-Jimenez’s response to the “full container load” statement was to question what sizes were to be ordered by Goaltex, that some items were not “moving” at all, and not to use the email as a final order, since backorders would affect the final outcome. This is hardly an indication that she had committed defendant to purchase an entire container load—whatever that might contain.
The spreadsheet attachment to a Correa-Jimenez email, showing sold items, which is relied upon by plaintiff as some proof of defendant’s assent to the purchase agreement plaintiff advances, does not serve that purpose. Rather, it indicates that defendant was unsure as to how much merchandise it needed, and thus does not indicate any agreement as to quantity or price.
Thus, the risk that defendant would not issue purchase orders within one year for all the merchandise plaintiff might buy from its manufacturer lay with the plaintiff, which, if it did not want to take that risk, needed to obtain a separate agreement that was outside the normal course of dealings between these parties. The documents submitted to the court on these applications show that this was not accomplished.
In view of the foregoing, the court must reject plaintiffs contention that a valid output or requirements contract existed. (Cf. Granite Capital Holdings, Inc. v Sherburne-Earlville Cent. School Dist., 84 AD3d 1607 [3d Dept 2011]; Lorbrook Corp. v G & T Indus., 162 AD2d 69, 73 [3d Dept 1990] [requirements contract must contain agreement as to price, identity of goods sold, minimum quantity, delivery, and time and method of pay *354 ment].) The nature of the repeated course of performance between these parties, in which prices and quantities defendant wished to purchase varied from purchase order to purchase order, merely emphasizes the absence of that type of agreement. (See UCC 2-306, 2-208 [1].)
Indeed, even if one could accept plaintiff’s contention and view the arrangement between these parties as a requirements contract, uncontradicted evidence would lead to the same result. Defendant’s employee Bennett’s testimony indicates that their main (and apparently sole) customer for Goaltex’s sneakers— IBNYS—had ceased ordering from defendant because it had decided to buy another type of footwear. (Bennett EBT at 36-39.) Plaintiff itself acknowledges this in its pleading, and in his affidavit Grubman asserts that the Goodwill-IBNYS contract had been canceled by IBNYS. (Grubman aff ¶ 6.)
Thus, the record clearly shows that defendant stopped ordering from plaintiff because defendant’s own customer for the sneakers, IBNYS, ended its ordering. This provides a good faith basis for a termination of defendant’s orders. “A shutdown by a requirements buyer for lack of orders might be permissible when a shut-down merely to curtail orders would not. The essential test is whether the party is acting in good faith.” (UCC 2-306, Comment 2.) Plaintiff’s own papers thus demonstrate that the defendant ceased ordering in good faith, and the court therefore concludes that it was not in breach of a requirements contract, assuming one existed. This is consistent with the Court of Appeals’ statement of the law in Feld v Levy & Sons upon which plaintiff relies. In that decision the issue was whether the defendant manufacturer (of bread crumbs, in that case) under a one-year output contract acted in good faith when it ceased production before the end of the year. Although the Court found that an issue of fact existed, it stated as part of its analysis that a “good faith cessation of production terminates any further obligations thereunder and excuses further performance by the party discontinuing production.” {Id. at 470.)
Therefore, given the Comment an unavoidable corollary of the law as expressed by the Court of Appeals in Feld is that a good faith termination by the buyer in a requirements contract also would excuse further performance pursuant to UCC 2-306. That is the case here. The undisputed loss of the customer that had repurchased what defendant obtained from plaintiff, and whose orders to defendant were the sine qua non of defendant’s needs and purchase orders to plaintiff, circumstances understood by both parties, excuses defendant from further performance.
*355 In sum, defendant has made out its prima facie showing supporting judgment as a matter of law, and plaintiff has failed to rebut that showing, nor has it made out its own prima facie case that it is entitled to payment for the merchandise it decided to order for defendant. Accordingly, the defendant’s motion should be granted and the plaintiff’s denied, including that branch that is to amend the case caption, which has been rendered academic.